Mr. Chief Justice TANEY
 

 delivered the -opinion of the court.
 

 This case is one of much interest to the parties concerned, and to the public.
 

 The. peculiar practice of Louisiana, which has been adopted in the Circuit Court for that District, has produced some embarrassment in this case. According to the laws of that State, unless one of the parties demurs on trial by jury, the court decides the fact as well as the law; and if the judgment is removed to a higher court for revision, the decision upon the fact as well as the law is open for examination in the appellate court. The record transmitted to the Superior Court, therefore, in the. State practice, necessarily contains all the evidence offered in the inferior court. And as there is no distinction between courts of law and courts of equity, the legal and equitable rights of the parties are tried and decided in the same proceeding.
 

 In the courts of the United States, however, the distinction between courts of law and of equity is preserved in Louisiana as well as in the other States. And the removal of the case from the Circuit Court to this court is regulated by act of Congress, and not by the practice of Louisiana; and the writ of error, by which alone a case can be removed from a Circuit Court when sitting as a court of law, brings up for revision here nothing but questions of law; and if the case has been tried according to the Louisiana practice, without the intervention of a jury, the decisions of the Circuit Court upon questions of fact are as conclusive as if they had been found by the jury.
 

 When this case was tried in the Circuit Court, neither party demanded a jury, and- the questions of fact which arose-in. it were .decided by the court. The record transmitted on. the writ of error set forth all the evidence, as is usual in appeals in the State 'courts; and it appeared that the authenticity of one ' of the instruments, under which the defendants in error claimed title, was disputed, and the conflicting evidence upon that subject stated in the record. The Circuit Court decided that the paper was authentic, and executed at the time it bore date. This question was fully .argued here, as will appear by the re
 
 *845
 
 port of the case in 3 Howard, 773; and the attention of the court not haying been drawn to the difference between an appeal in the State practice and the writ of error from this court, it did not, in considering the case, advert to' that distinction. And being of opinion that the weight of evidence was against the - authority of that instrument, it rejected it as not legally admissible, and, proceeding to decide the case as if it were’not before the court, it reversed the judgment which the court below had given in favor
 
 of
 
 the defendants. Upon reconsideration, however, we were unanimously of opinion, that the decision of the Circuit Court upon this question of fact must, like the finding of- a jury, be regarded as conclusive ; that the writ of error can bring up nothing but questions of law; and that, in deciding the question of title in this court, the paper referred to must be treated and considered as authentic, and sufficiently proved. And in order that the defendants might have the benefit of the decision ip the Circuit Court, the case was reinstated in this court at the last term, to be heard and decided upon the questions of law presented by the record, as it was originally brought up, without prejudice from the former decision of this court.
 

 It has been again argued at the present term ; and the case as it appears upon the record is this.
 

 It. is a petitory action, brought and proceeded in in the Circuit Court, according to the Louisiana State practice. The suit is brought by the United States against Richard King, one of the defendants in error, for a parcel of land lying in that State, and described in the petition. King answered, admitting that he was in possession of the .land, and claiming title to it under a conveyance with warranty
 
 from
 
 Daniel W. Coxe, the othe’r defendant; and prayed that he might be cited to appear ■ and defend the suit.. On the same -day, Coxe appeared and answered, and alleged' in his defence, that the land sued for was part of a large tract of land which had been granted'by the ■Baron deCarondelet to the Marquis de Maison Rouge, by an instrument of writing, dated June 20th, 1797, which he sets out at large in his answer; and by sundry intermediate conveyances, be deduces a title from Maison Rouge to himself for three fourths of the entire tract. He insists that the instrument of writing executed- by the Baron de Carondelet was a complete grant conveying to the Marquis de Maison Rouge an indéfeasi- - ble title to the land therein mentioned, and -that, from the date of the said instrument, it ceased to be a part óf the royal domain, and became the private property of. the said Maison Rouge. He also avers that this grant was made in-consideration of services rendered by Maison Rouge in settling thirty
 
 *846
 
 emigrant families on the Washita River, in Louisiana, under a contract made by him with the Baron de Carondelet, dated March ' 17, 1795, and approved by the king of Spain on the 14th of July in the same year. And he then proceeds, in his answer, to assume, the character of plaintiff in reconvention, and prays that the grant of the 20th of June, 1797, to the Marquis ode Maison Rouge may be declared valid, and ,that lie and King maybe recognized to be the lawful owners of the'parts of the said grant held by them, as described in the answer of King, and in a schedule annexed to his (Coxe’s) answer, and that they may be quieted in the ownership and possession of the same, and that the United States may be ordered to desist from treating and considering any part of said grant, as designated in a certain survey by John Dinsffiore, referred to particularly in his answér, as public property.
 

 Upon this issue the partiés proceeded to take testimony, which is set out in full in the record. A great part of it is immaterial, an'd much of it relates to questions of fact which were disputed in the Circuit Court. This mode of making up the record, which is borrowed from the State practicej is irregular, and unnecessarily enhances the costs when a case comes up on writ of error. In cases where there is no jury, the facts, as decided by the court, ought regularly to be stated, and inserted in the record, ,provided the parties cannot agree on a statement. This is most usually done by the court in pronouncing its judgment. In this case, there is a statement by the judge who decided- the case, containing his opinion both on the facts and the law, and which is -attached to the record, and has been sent up with it. But this opinion appears to have been filed, not only after the suit had been ended by a final judgment, "but after a writ of error had been served removing the case to this court. This' statement-of the judge cannot, therefore,' b$ regarded as part of the record of the proceedings in the Circuit Court, which the writ of error brings up, and cannot therefore be resorted to as a statement of the case. And as there is'no. case stated by consent, it is necessary to examine whether the facts upon which the question^ of law, arise sufficiently appear in the record to enable this court to take cognizance of the case.
 

 As we have already said, the action brought by the -United States is what, in the practice -in Louisiana, is called a petitory action, and is in the nature of an ejectment in a court of common law. In a State court where there is no distinction between courts of law and courts of equity, the plaintiff in a petitory action might recover possession, or a defendant defend himself, under an equitable title. But the distinction between
 
 *847
 
 law and equity is recognized everywhere in the jurisprudence of the United States, and prevails (as this court has repeatedly decided) in the State of Louisiana, as well as in other States. And if these defendants had possessed a&equitable title against the. United States, as contradistinguished' from a legal one, it would , have been no defence to this action. But no such title is set up, nor any evidence of it offered. The defendants claim under what they insist is a legal title, derived by the Marquis de Maison Rouge from the Spanish authorities.
 

 Under the treaty with Spain, the United States acquired in sovereignty all the lands in Louisiana which had not before been granted by the Spanish government, and severed as private property from the royal domain. It was incumbent, therefore, upon the defendants, to show' that the land in question had been so granted by the Spanish authorities; otherwise the United States were entitled to recover it.
 

 The defendants,, in their answer, allege, that it is part of a' tract of land that was granted to the Marquis de Maison Rouge by. an-instrument of writing executed by the Baron de Caronde-letin 1797. 'This instrument refers to the royal order of 1795, and the figurative plan of Trudeau. The defendant Coxe also refers in his answer to these instruments, as containing a part of the evidence of his title ,- relying upon the paper of 1795 as showing the services which formed the consideration of the instrument upon which he relies as a grant. These instruments were all received by the Circuit Court as authentic and sufficiently. proved, and are set forth at large in the record. The question - between the United States and the defendants is, whether, according to the - Spanish laws at that timé in force in 'the province of Louisiana, the instrument of writing dated in 1797 pássed the title to the land described in the figurative "plan of Trudeau to the Marquis de Maison Rouge, as hhs private property.
 

 This is a question of law to be decided by the court. And it is altogether immaterial to that decision, to.inquire what emigrants were introduced by Maison Rouge, or what authority he exercised within' the territory in question, because whatever was done by-him.is admitted to have been done-under and by virtue of the authority derived from the instruments before mentioned; and it depends upon their construction to determine whether it was done as the' agent of the, government or as owner of the land. ■ His acts cannot alter, their cbnstruction.
 

 Confusedly, therefore, as this record has been made up, and loaded as it is with irrelevant'and unnecessary parol testimóny, the facts upon which the question of title arises áre as fully be
 
 *848
 
 fore us as if they had been set forth in the form of a case stated; the disputed question' as to the authority of the plan of Trudeau being, so far as this writ of error is concerned, finally settled by the decision of the Circuit Court.
 

 We proceed, then, to examiné the question of' title, and to inquire whether the land in question was conveyed to the Marquis de Maison Rouge by the Spanish authorities before' the cession to the Uriited States.
 

 The paper executed in 1795 is evidently a contract to bring emigrants into the province, and not a grant of land.
 
 But
 
 as the instrument relied on by the defendants as a grant refers to this, and is founded upon it, it is necessary to examine particularly the stipulations contained in it, in order to ascertain its object, and to see what rights were intended to be conferred in the land destined- for the proposed settlement, and to whom, they were to be granted.
 

 This agreement states that the Marquis de Maison Rouge, an emigrant French knight, had proposed to bring into the province thirty families, also emigrants, for. the purpose-of forming an establishment with them on the lands bordering on the Washita River, designed principally for the culture of wheat and the manufacture of flour. And the provincial authorities agreed to pay to every family one.hundred dollars for every useful laborer or artificer in it, to furnish guides from New Madrid ór New Orleans to the place of destination, to pay the expenses of their transportation from those places, and to grant to-each family containing' two white persons- fit for agriculture ten arpens of land, extending back forty arpens, . and increasing in the - same proportion to those which should contain a greater number -of white - cultivators. And European servants brought by the emigrants, bound to serve six or more years, if' they had families, were to be entitled to grants of land, proportioned in the same manner to their numbers, upon the expiration of their term of service.-
 

 If will be observed, that this contract contains no^ stipulation in favor of Maison Rouge. All the engagements on the. part of the government are in favor of the emigrants who should accept the conditions. Indeed, it seems to have been.,.no part of the purposes of this agreement to regulate the-compensation which he was to receive for his services. Its only object, as appears by the concluding sentence, was to make known the offers made by the Spanish government to those -who were disposed to come,. It was therefore to be shown by the Marquis to thosé whom he invited to remove to his establishment, arid it. does not appear;to have been thought necessary, and perhaps was not desirable, that his compensation or his interest in
 
 *849
 
 forming the colony should be made public. That was a matter between him and the Spanish authorities, which doubtless was understood on both sides. .And whether it -was to be in money, or in a future grant of land, does not appear. Certainly it was not to be in the land on which this establishment was to be formed, because the government was pledgéd to grant it to the colonists. The provincial authorities, it seems-, had not’ the power, by virtue of their official stations, to enter into this agreement. After-it was drawn, it was' transmitted to the king of Spain for his- approval; and he ratified and confirmed it by a.royal order. All that was done under it, therefore, was done under the authority of this special order, and not by virtue of any power which belonged to the provincial officers,- in virtue of the offices they held.
 

 It is manifest from this contract,.approved as it was by the king, that Spain, was at that, time particularly anxious to strengthen herself in Louisiana, on the Washita River, by emigrants from Europe. It is a matter of history, that, at that period, the political agitations .in France and the neighbouring nations on the, continent of Europe induced many to emigrate. These emigrants were, for the most part, persons who were attach d to the ancient order of things, or who were alarmed or dissatisfied with the changes which.were .taking place around them, and .consequently were precisely of that character, and imbued with those political feelings, which the Spanish' government would prefer in the colonists who settled ;in the province of Louisiana. The very liberal and unusual terms offered in this contract shows its anxiety on the subject. Its evident object was to obtain a body of agriculturists from the continent of Europe, who would settle together under one common leader, in whom the government could confide, and form a colony or establishment of themselves. Such a colony, in sufficient numbers to afford some degree of protection against Indian marauders, would, by opening, cultivating, and improving the place of their settlement, create inducements to others of their friends or countrymen to. join them, and thus promote the early settlement of that part of the province, which this agreement shows die Spanish government was anxious, to accomplish.
 

 The Marquis de Maison Rouge, it seems, from his position as an emigrant French knight', was regarded as a suitable person to be employed in. forwarding this policy. What were his peculiar duties is not defined in this agreement; but it appears that he was to make known, the offers of the government, and select the colonists, and superintend the settlement and formation of the establishment. It is too plain to be question-?
 
 *850
 
 éd, that, in doing this, he was, by the agreement, to act as the agent of the government, and hot as the proprietor of the land.
 

 The contract specifies no particular place on the Washita. It merely provides that it should be on the lands bordering on that river. And the Spanish authorities, in their desire to settle that part of the province, — as these unusual offers so clearly evince, — would naturally be ready to- make grants, to others. There was danger,' therefore,- that the unity of the establishment of Maison Rouge might be broken in upon by intervening grants to persons with whom he had no connection, and who, as they did not come under his auspices, might not be disposed to submit to his superintendence, or acknowl-edgé the authority which the Spanish government had conferred on him. The Success of his establishment might thus be endangered. There was another omission’. He contracted to bring in thirty families. It- might well be’ doubted, under the terms of this agreement, whether the promises ’ of the government extended beyond that
 
 number;
 
 and others might be deterred from coming, under.the impression that they would not reap the like .advantages. These omissions were calculated to embarrass the establishment,' and retard its success. Indeed, it appears by the figurative plan of Trudeau, that grants to others had then already been made in the territory there marked out; and it will, appear, we think, upon examining the instrument of 1797, that these were the omissions it intended to supply, and the difficulties' it intended to remove. It -was to carry the plan of 1795 into more, perfect execution, not to make á grant to Maison Rouge.
 

 ' It begins by réciting that the Marquis de Maison Rouge had nearly completed the establishment on the Washita which he was authorized to make by the royal order of 1795, and- then assigns, as a reason for executing this 'instrument, the desire to remove for the future all doubts respecting other families or new colonists that might-come to establish themselves. ' This is the only motive assigned, and therefore was the only object which, this paper was intended to accomplish. The doubt had arisen under the contract.of 1795, and that doubt did not concern Maison Rouge nor the thirty families which he had com tracted to -bring, but other families and new colonists that might come to establish themselves. And in order to -remove these doubts, it destines and appropriates for the establishment aforesaid the thirty- superficial leagues marked in the plan of Trudeau, under the terms and conditions stipulated and contracted for by' the said Maison Rouge. That is to say, it Appropriates a large tract of country, far beyond the wants of the thirty families, in order to show that there would be room for
 
 *851
 
 the other families or new colonists. It is to be for the exclusive use of the colony which Maison Rouge was to establish, to prevent the apprehension of disturbance from other persons; and it js declared to~ be under the same terms and conditions, in order to satisfy those other families, or new colonists, that thé liberal provision made for the thirty families would also be extended to them.. And the instrument also states that this, territory is appropriated for “the establishment aforesaid,” that .is, for the establishment authorized by the. contract of 1795, and not for one to be made under a new contract; and it further states,' that it is made by virtue of the powers granted by the king, evidently - referring to the royal order which wás before mentioned ip this instrument, and showing that the provincial officers who'signed it were acting under special authority, and not under their general powers to grant land. Every expression in this instrument indicates that it was executed to remove doubts which might arise under the previous contract, and to carry that plan into full effect.. There is not a word or provision in it which implies that there were any doubts about the rights of Maison Rouge under his contract, or that' he was to have any other rights under this than were given to him by his former agreement. The land is appropriated for “ the establishment aforesaid.” ■ In other words, it was to be the same éstablishment, with, the same rights, but with limits more distinctly defined, and. the rights of other families and new colonists who. might unite themselves with the original thirty more clearly recognized.
 

 It is said that the last instrument should be construed by itself, as distinct from the previous contract, and that the contract of 1795 .was referred to merely to show the services which were rendered under it by the Marquis de Maison Rouge, as.the consideration upon which this grant was made to him. It is a sufficient answer to this argument to say, that the last instrument, in express terms, states that the motive for making it was to remove doubts in the former one as to other families and new colonists, and consequently could not have been designed to be an independent agreement, conferring new rights upon. Maison Rouge alone. It in. effect negatives the idea, that' the first Was regarded as a mere consideration; for upon such an interpretation, there would be no doubts to be removed as to the new colonists. They would have no interest in it.' There would be the certainty that the services had been rendered by Mdison Rouge, and that this instrument intended, to reward him. Besidés, the last instrument would be unmeaning and unintelligible Without .referring to. the firsthand construing them together. It would be impossi
 
 *852
 
 ble, without taking the two agreements ‘together, to understand from the last what was meant by the. establishment of the Marquis' de Maison Roügé, or how it was to be formed, or what were to be the priviléges of the new colonists, or -what were the conditions contracted for by Maison Rouge. None of these things are specified, in the instrument of 1797. It refers for them to the former contract.
 

 But if this instrument is. taken by itself, and regarded as independent of the other, it contains no “words of grant, none, of the words which were employed in the colonial Spanish grants which intended to sever the. land from the royal domain, and to convey it as individual private property. It is ■true that the Spanish colonial grants are in general more summary and brief than common law conveyances. But they are by no means loosely or carelessly expressed; and it must not be supposed that they are ambiguous, because they are brief. On the contrary, the intention to, convey is always expressed in clear and distinct terms. And these, grants, like the patents for land, issued by the government in this country; appear, to have been prepared by officers of the government well ac-quáintéd with- the coloniál usages and forms. Thus,- for example; in the case of Arredondo and Son, reported in 6 Peters, 694, where thé grant was for a large tract, upon condition that-the parties should at their own expense establish two hundred families upon it, it is expressly stated, that the land was granted according to the figurative plat, “ in order that they may. possess the,., same as their own property, and- enjoy it as the exclusive owners thereof.”
 

 It cannot be. supposed that a grant of thirty superficial. leagues, far beyond the quantity, usually conveyed to an indi-, vidual, would have been carelessly drawn in new and unusual terms, calculated to create doubts, and that established forms and usages would be disregarded and needlessly departed from. Certainly there is every reason to believe; that, if this land was-intended to be conveyed to the Marquis de Maison Rouge, that intention would have been expressed withy at least ordinary perspicuity. Yet, among the many cases of .Spanish colonial grants which have come before this court, we are not aware of one, great. or small, in which a paper in language resembling this has. ever before been produced and claimed as a grant.
 

 The note at the foot of this instrument has been relied on to prove that it was intended to be a grant.. We think it is not susceptible of. that construction, and ■ that its language proves the contrary. The note is a short one, and merely •says, that,. “ in conformity with his contract, the Marquis de Maison Rouge is not to admit or . establish any American on
 
 *853
 
 the lands included in his grant.” Thfe lands mentioned in this note are undoubtedly the lands described in the body of the instrument, and his establishment was to be formed on them. The note apprises him, that, in doing so, he must conform to his contract, and not admit any American. There was therefore a preexisting contract in relation ’to this settlement.by which the rights of the parties were defined, and by 'which Maison Rouge was .prohibited from- admitting or establishing 'Americans upon this land. The contract' referred., id:is evidently the contract of 1795. We hear of no othen’-TUe thirty families which Maison Rouge was to introduce- .under that agreement were to be emigrants, — Europeans; and- he is-to conform to this stipulation, in introducing, the "other , families and new colonists, in the thirty superficial leagues marked out on Trudeau’s plan. They were not to be. Americans... The establishment formed on this land was therefore to be made under the contract of 1795, and the rights of both parties regulated by it. The note in question was appended, because the body of the instrument referred only to the undertakings of the government, and without this .note Maison Rouge . might have regarded himself as absolved from his agreement as to the character of the additional or new colonists. But how- could he be required to conform to his contract, unless the contract spoken of was to be carried in$o execution upon this territory? The words, “lands included in his grant,” which are used in the note, mean nothing more than the lands set apart and appropriated by this instrument for his establishment ; and to give them any other meaning would make this brief note unmeaning. and inconsistent with itself. He was not to admit or establish Americans in the territory destined and appropriated for the establishment which he was to form, under the contract of 1795, — that- contract - requiring this establishment to be formed of emigrants. This appears to be the plain meaning of this note, and we can see nothing in it. that will justify a different construction, or give any reason to suppose that a grant was intended to Maison Rouge as his private property.
 

 It is objected, also, that the decision of the Circuit Court, upon the question of title, is not brought here by the writ of error, because no exception was taken to it in the court below: But no exception can be taken where there is no jury, and where the question of law is decided in delivering the' .final judgment of the court. It is hardly necessary to refer to authorities on' this point; but it may be proper to say, that in Craig
 
 v.
 
 The State of Missouri, 4 Peters, 427-, and in another case which wé shall presently notice, this court have held,
 
 *854
 
 that, where the Circuit Court decides, as in this case, both the fact and the law, no exception can regularly, be taken. Even in a court of common law, an exception is never taken to the judgment of the court upon á case stated, or on a special verdict ; yet the judgment is subject to revision in the appellate. court. The same rule must prevail where the facts upon which the inferior court decided appear in the record; — like a case stated, the question in the superior court necessarily is, whether the judgment of the. court below was erroneous ór. not upon the facts before it,, as they are certified in the record.
 

 . Under this view of the subject, which brings the question of right directly before us for decision, it is-perhaps hardly necessary to-say. any thing as to the manner in which the judgment was entered in the Circuit Court. But if the defence of King could have been maintained, yet the language in which the judgment was rendered is open to serious objection. It may -have been intended to cover only the land in controversy in the suit against King.. But it may well bear the construction of being not only a judgment in favor of King, but also in favor of Coxe, for the large, portion of this territory to which he claims title in his answer, and for which he became plaintiff in recori-vention against the United States under the Louisiana practice. In. the opinion before mentioned, which was filed by the judge after the case had been removed by writ of error, he states that he overrules the plea in reconvention because it. placed the United States in the attitude of a defendant as to the land thus claimed. This decision is undoubtedly right. Bjit yet in the judgment, as stated in the record, the plea in reconvention is not overruled, and its language would rather seem to imply that it wás a judgment against the United States in favor of Coxe foi the land claimed by him in reconvención, ás well as in favor of King for the land sued for by the United States. 'If this is the meáning of the judgment, it would be obviously erroneous, even if King had made good his defence.. But it is unnecessary to decide what is its. legal construction, because, in either view of it, the judgment is erroneous, and must be reversed,
 

 Neither is it necessary to examine in detail the' exceptions taken at the trial to the admission of testimony.. .In some unimportant particular, the evidence objected to. was' not admissible. But where, the court decides the fact and the law without the intervention of a jury, the admission- of'illegal»testimony* even if material, is not of itself a ground for reversing the judgment, nor. is it properly the subject of a bill of exceptions. If evidence appears to have- beén improperly admitted,
 
 *855
 
 the appellate court will reject it, and proceed to decide the case as if it was not in the record. • This is the rule laid down in the case of Field et al.
 
 v.
 
 The United States, 9 Pet. 202, and is undoubtedly the correct one. It is certainly proper* where evidence supposed not to be legal is received by the court, to enter on the record that it was objected to. But this is done to show that it was not received by consent, and a formal bill of exceptions is not required to bring it to the notice of the superior court. It may, however, be done in that form, if the parties and the court think proper to adopt it; and the objections have. been so stated in this case, in conformity, we presume, with the Louisiana practice. But as the material evidence in the case was all legally before the Circuit Court, it would be useless to examine whether érrors were committed as to .portions of - it which are altogether unimportant. And this court being of opinion, for the reasons hereinbefore stated, that this instrument of writing relied, on by the defendants did not convey? or intend to convey, the land in question to the Marquis de Maison Rouge, the judgment, of the Circuit Court must be reversed, and the cause remanded, with directions to enter a . judgment for the United States for the land described in their petition.
 

 Mr. Justice McLEÁN, Mr. Justice WAYNE, Mr. Justice McKINLEY, and Mr. Justice GRIER dissented from this opinion. Mr. Justice McLEAN and Mr. Justice WAYNE filed opinions in writing, as follows.
 

 Mr. Justice McLEAN.
 

 Had not my brother judges pronounced the above opinion, I should not have supposed there could be any difficulty in determining the character and effect of the grant in question. Being in the minority, I shall only state some of the grounds on which my opinion has been formed.
 

 The validity of the grant depends upon the laws .of Spain in 1797, the time it .bears date. Those laws .were foreign, and are required to be proved. The incorporation of Louisiana into the Union cannot affect this principle. The treaty of cession and the acts of Congress subsequently enacted, recognizing private
 
 rights in
 
 the ceded territory, only reiterated the well-established principles of the laws of nations. In the language of the act of Congress, we are to look “to the laws and ordinances of the government under which the plaim originated.”
 

 On the 17th of March, 1795, the Baron de Carondelet, Governor of Louisiana, and others, entered into a contract with the Marquis de Maison Rouge, which was sanctioned by the king of
 
 *856
 
 Spain, to bring into “ these provinces thirty families, emigrants, for the purpose of forming an establishmént with them on the , lands bordering upon the Washita, designed principally for the culture of wheat,” &c., on the following
 
 conditions:
 
 —- 1st. Two hundred dollarsto .be paid out of the royal treasury for every family composed of two persons fit for agriculture, &c., four hundred dollars to those having four laborers, and in the same proportion for a less number. 2d. A guide. to be furnished them. 3d. Their transportation to be paid, not exceeding three thousand pounds to each family. 4th. Ten arpens of land, extending back forty arpens, for a family of two laborers,, and in the same proportion for a greáter number. 5th. Other privileges.
 

 The Marquis performed much labor, and consequently incurred much expense, in the fulfilment of the contract. And on the 20th of June, 1797, the Baron de Carondelet and Andres Lopez Armesto executed to the Márqúis the following instrument : — “ Forasmuch as the Marquis, de Maison Rouge is near completing the establishment of the Washita, which he was authorized to make for thirty families, by the royal order of July 14th, 1795, and desirous to remove for the future all doubt respecting other families or new colonists who may come to establish themselves, we destine and appropriate conclusively for the establishment of the aforesaid Marquis de Maison Rouge, by virtue of the powers granted to us- by the king, the thirty Superficial leagues marked in the plan annexed to the head of this instrument, with the limits and boundaries designated, with our approbation, by the Surveyor-General, Don . Carlos Lareau Trudeau, under the terms and conditions stipulated and, contracted by the said Marquis de Maison Rouge,” &c.
 

 “ Note, that, in conformity with his contract, the Marquis de Maison Rouge is not to admit or establish any American in the lands included in his grant.”
 

 The certificate of the surveyor, Carlos Trudeau, laid down . the surveys with precision, stating the superficial total at two ‘hundred and eight thousand three hundred and forty-four superficial arpens, equal .to thirty leagues, &c. And the surveyor adds: —“It being well understood that the lands included ' in the foregoing plats, which are held by titles in form, or by virtue of a fresh decree of commission, are'not to compose a part of the thirty .degrees; on the contrary, the Marqqis of Maison Rouge promises not to injure any of the said occupants, promising to maintain and support them in all their fights, since if it should happen that the said thirty leagués should suffer any diminution óf the land occupied, there will be no objection or inconvenience to the said Marquis de Maison
 
 *857
 
 Rouge’s completing or making up the deficiency in any other place where there are. vacant lands, and to the satisfaction of the concerned.”
 

 This survey, being annexed to the patent and referred to in it, constitutes a part of the grant, with the conditions specified.
 

 The error in the ^argument seems to be in supposing, this grant to have been issued in fulfilment of the contract of. 1795. The grant was in no way connected with that contract, except as showing the consideration on which the grant was- made to the Marquis, ánd with the express view of relieving the royal treasury, which was often without funds, from the charges imposed by the contract. Charles Tessier, now a judge in Louisiana, was chief clerk in the land-office, and who made out the grant, states, that “ Rendon and Morales successively filled the office of intendant, and being charged with the public finances, which were' greatly embarrassed for want of money, they made difficulties about paying for the families which Maison Rouge introduced and was authorized to introduce, and tried to get rid of farther advances to Maison Rouge.”/ And the witness says the land was not worth so much as the expenses of the government might amount to in the end. And J. Mércier, another witness, confirms the statement of Tessier.
 

 The triith of these statements is sustained by the words of the grant. The royal order of. 1795 being referred to, the grant states: — “ And desirous to remove for the. future all doubt re- . specting. other families or new colonists who may come to establish themselves, we destiné and appropriate conclusively for the establishment of the aforesaid Marquis de Maison Rouge,” &c. Now it must be observed that the Marquis was the mere agent of the government under the contract of 1795. He was to have no interest in the land, nor did the government, in the contract', propose to pay him for his services. That this enterprise was deemed one of great importance is shown by the gratuity of land and money given by the government to families, and also in agreeing to pay the expense of their transportation. And the government being “ desirous to remove for the future all doubt respecting other families or new colonists who may come to establish themselves,” &c. These were no part of the families under the first contract, but
 
 “
 
 other families.” So that the 'families or colonists which should come under the grant were not to come under the contract, but to settle under the .grant, having no claim on the government. This1 relieved the royal treasury from any further embarrassment on account of the contract of 1795, and removed all doubts in regard to such settlers.'
 

 
 *858
 
 But the land was granted to the Marquis de Maison Rouge, subject only to the terms of the grant and of those specified in the certificate of the surveyor,'which were incorporated into the grant. The conditions thus expressed were, that the Marquis should not admit “ any American in the lands included in his grant.” And. he was to protect the rights of those who'had a good title to íands within his grant, and should receive other lands in lieu of those thus held. These two conditions consti-. tuted the contract referred to, I have no doubt, in the note affixed to the grant. There was, then, no connection between the grant and the contract of 1795, except as the latter showed the meritorious services'of the Marquis, which constituted, in part at least,, the consideration q'f the grant.
 

 But was-this instrument a grant ? ■ Under the common law it was not a grant, but it .is one under the civil law. If the instrument separates the.land from the public domain, and appropriates it to the use of an individual, it is a grant. No words of inheritance or terms of grant are necessary by the civil .law. In this grant the words are, “ We destine and appropriate conclusively for' the establishment of the aforesaid Marquis,&c. Now these terms appropriate the land described “ conclusively.” Nothing, could be'-more specific than this. It separates the land designated in the plat from the lands in the crown,, and no subsequent condition was annexed. He had nearly completed the establishment of the Washita under the contract of 1795, and for these services the grant was made. If the grant had required the Marquis to do -certain things, as to settle a number of families, there would be some apparent ground to say, that' he, or those claiming under him, must show a preformance of the condition. But even in such a case the grant would be good, for the cession of the country by Spain to France,' and by France to the United States, within a short time after the grant, would have excused i;he performance of such, a condition, It would be strange indeed if our goven-ment should require the performance of a condition which exeluc "s our own citizens from benefits, and gives them to foreigners. This point has been decided in the case of Arredondo.
 

 But the most conclusive answer to this view is, that the grant required no such condition, and that, in this respect,'it has no connection with the contract of 1795. That'contract, by this grant, was admittéd to be nearly completed, and there was no requirement ,tbat it should be completed. It was found •burdensome to the treasury, and was abandoned. Under that ■contract, titles were made.to the settlers, and not to the Marquis: And the land for the thirty families would have required a sm'all tract in comparison with that covered by the grant.
 

 
 *859
 
 This instrument, it is said, does not purport to be a grant. If this be so, those who issued it, and all others who have offi-, cially and professionally examined it heretofore, have been strangely mistaken. Charles Tessiér, who was a principal clerk in the office of the Spanish government of Louisiana for making grants of land, and who made out this grant, says it
 
 “
 
 was denominated and considered as a
 
 titulo en
 
 forma, and was such complete and perfect evidence of title as not to require any other to validate or strengthen it.” J. Mercier, who was. a clerk in the land-office with Tessier, also states that it is a' grant. Both of these persons, from their public duties, must have been as well acquainted with the forms of titles then used, and indeed better, than any .other persons. And this is a matter of fact to be. established.
 

 The commissioners appointed by the government to investigate land titles in Louisiana reported, in 1812, “ that the instrument .under date of the 20th June, .1797, is a patent, or what was usually, in Louisiana, denominated a title in form.”
 

 This claim being before the House of Representatives in ■1817, a committee reported, that they “ aré of opinion that it is a legal and formal title, according to the laws and usages of the . province of Louisiana.” Other reports were made by a committee of the Senate confirmatory of the grant. The confirmation of the claim to a league square, by Congress, was, a recognition of the grant. On no other supposition could the act of the 29th of April, 1816, confirming • the league square, have been passed.
 

 There can be no question that this grant' would have been held valid under the Spanish government, and, both by the treaty of cession and the laws of nations, it must be held valid by this government.' The largeness of the claim can be no objection to it. Tracts as large were given, for services, less meritorious than those rendered by the Marquis de Maison Rouge, by the Spanish government. Grants were made, under that government, for services, civil or military, performed or to be performed. And there was no service deemed more meritorious by Spain, except military service, than that of establishing colonies, reducing the country to cultivation, construct-, ing mills, and other improvements. The quantity granted was left generally to .the discretion of the governor or other officer who. represented his sovereign in making the grant.
 

 . If this instrument be a grant which would have been held valid by the Spanish government, then we are bound in. good faith so to consider it. . And" I cannot entertain any doubt that it is a complete grant, and therefore I dissent from, the decision of a majority of the court.
 

 
 *860
 
 Mr.. Justice WAYNE.
 

 Four of us do not concur with the majority of the judges in the judgment given by them in this case.
 

 I will now give my reasons Tor not doing so, comprehending in what I shall say, as well I can, those objections which were urged, in our consultations upon the case, by Messrs. Justices McLean, McKinley, and Grier, against the judgment.
 

 Apart from every consideration connected with the intrinsic validity of the grant, arid the defendants’ title under it, I regard this judgment as unwarranted either by the case presented on the record, by t^d conduct and decision of this court in respect to it. at the last term, or by the course and argument of counsel which have necessarily resulted from, and been limited by, that decision. Besides^ in my view, it does injustice to other parties, now regularly before the court, who were entitled to be heard, according to our rules and practice, before a decision was made which, in effect, decides their rights, and takes what may be their property from them, without a hearing,
 

 j On thése grounds I dissent from the judgment. But in addition to them, the evidence'on the record, imperfect as it may seem to be to others as to the intrinsic merits of the defendants’ title, —- for that point does not purport to be now presented for our adjudication, -— is yet sufficient to satisfy me that the grant to the Marquis de Maison Rouge is, in form and substance, genuine, valid, arid cbmplete, conferring upon him, and those, who claim under him, a just and perfect title under the treaty by which Louisiana was ceded to the United States.
 

 This suit was a petitory action, brought by the United States in the Circuit Court of '’Louisiana, in the year 1843, to recover from the defendant, Richard King, a tract of land of 4,606 acres, lying on the west side Of the Washita River, in that State. The defendant denied that the United States, had any title to the land; and he further prayed, in accordance with the law and practice of Louisiana, that, as he derived his title, by purchase from Daniel W. Coxe, Who had warranted it, he might be cited as warrantor, and made a party defendant in the suit.
 

 Coxe came.in and filed his answer. He also denied that the United States had any title to the land; and he further alleged, that the tract in controversy was part of a large body of land to which his own title was a valid one, derived from the Marquis de Maison Rouge, who was an-inhabitant of Louisiana, to Miom the Spanish government had granted it in due form, and in whom it was legally vested previous to the treaty of the 30th of April, 1803, which' ceded that territory to the United States, and ‘guarantied to the inhabitants the full enjoyment of their property. In his answer, he further put in a plea of “recon-
 
 *861
 
 vention,” also in accordance with the law and practice of Louis* iana, wherein he asked to be quieted in his own title to the whole grant, against the United States; and he annexed a statement, marked Schedule A, in which the different tracts sold by him since he became the purchaser were particularly set forth, among which was that conveyed to the defendant King, for the recovery of which the suit was brought
 

 By the Code of Procedure of Louisiana, (Art. 494. 495,) thé mode of proceeding in which must, by the provisions of the act of Congress of the 26th of May, 1824, (4 Stat at Large, 63,) regulate the practice of the courts of the United States in that district, either party is entitled to a trial by jury; but if that mode is not preferred, the issue of fact, as well as of law, is to be tried by the court, the finding of the facts by the court being, in that event, equivalent to'the verdict of a jury. This was done in the present case.
 

 In the summer of 1843, the defendant and warrantor, Coxe, being anxious for the termination of the suit, entered into an agreement, which appears on the record, (page 80,) whereby it was stipulated that it should be immediately set down for trial, and he consented to the admission of much documentary evidence, chiefly derived from, or appended to, report's of committees of Congress. Among these documents was a pamphlet published by a person of the name of Girod, who was an adverse claimant .to a tract of land alleged to be within the Mai-son Rouge grant; and also several depositions, annexed to the pamphlet, which purported to have been legally taken in suits that had been instituted many years .before against the defendant Coxe.. It was also stipulated by the agreement, that bills of exceptions might be taken by either party, not only during' the actual trial, but even after the decision, until'the record, if there should be a writ of error, was transmitted to this court.
 

 When the trial carne on, the plea of reconvention put in by the warrantor was dismissed by the court, “-because, under the practice' of Louisiana, it is to be regarded in the light of a new suit, and consequently places the government in the attitude of a defendant before the court.” (Record, 182.)
 

 In addition to the documentary evidence admitted by the agreement, a number of -persons were examined at the bar. Their testimony appears to have been mainly directed to establish the genuineness and authenticity of the grant of Baron Carondelet to Maison. Rouge, and of the
 
 plano figurativo
 
 of Trudeau, the surveyor-general, which was annexed to itto rebut the contrary evidence derived from Girod’s pamphlet, and which was supposed to exist in the old depositions printed with it; and to show the complete validity of. the grant in question,
 
 *862
 
 so far as it depended on the Spanish laws and the recognized and settled practice of the Spanish government. None of the oral testimony — and there were seven or eight witnesses — was reduced to writing, or' appears in any shape or form upon the record.
 

 After a trial, which occupied several days, the Circuit Court found and decreed the grant of the 20th of June, 1797, to be a valid instrument, and adjudged the title under it of the defendant King, and Coxe, his warrantor, to be legal and good to the tract mentioned in the answer of the former, and in Schedule A annexed tb that of the latter. This, under the law and practice, of Louisiana, was a complete and definite finding .by the court of the facts at issue, — equivalent to the verdict of a jury.
 

 No opinion was delivered by the court at the time this decree was given, but one was subsequently prepared and filed, and is annexed to the record. It presents in a cogent and succinct manner, but more in detail, the matters of fact, of which' the decree gives the summary result; and shows that they were founded on very full evidence, oral as well as documentary, and especially that the testimony derived from Girod’s pamphlet was, in the opinion of the court, conclusively disposed of by that of “ persons who had equal, if not better, opportunities of acquiring a knowledge of the facts set forth.”
 

 No exception was taken on the behalf of the United States to any portion of this opinion, although the agreement gave full power to counsel to do so at any stage of the legal proceedings.
 

 In the progress of the trial, however, five bills of exceptions were taken by the counsel of the United States to the rulings of the court, and three by the defendants. Upon the latter it is unnecessary to express an opinion, as the judgment was- in favor of the defendants, further than to remark, that, if it had been otherwise, they might have afforded a sufficient ground for its reversal.
 

 The bills of exceptions on the part of the United States did not embrace any error in the opinion of the court, or in its de-' cisión of any legal point arising out of the validity of the grant, or its construction, or the Spanish law or practice in relation to such instruments, but were confined exclusively tb the rejection and admission by the court of certain documentary' evidence. To each bill of exceptions was annexed, separately and distinctly, the testimony connected with it and necessary to a decision upon it.
 

 A writ of error was issued in behalf Of the United States, returnable to this court at Decémber term, 1843. With this writ of error were returned not only the five bills of
 
 *863
 
 exceptions taken by the counsel of the United States, with the evidence embraced therein, but also the three bills of exceptions taken by the defendant. This, however, formed but a small part of the errors of the clerk of the Circuit Court in making up'and returning the record. To these bills of exceptions he annexed a great mass of documentary testimony, a large part of which consisted of, printed pamphlets, and among them the pamphlet of Girod, with its appendix; but whether all even of the documen-. tary testimony which had been exhibited at the trial was embraced, did not appear ; and it is certain that no portion whatever of the parol evidence had been reduced to writing, or was embraced' in the record, although the judge had expressly relied upon it as contradicting the allegations in the documentary evidence. It also contained evidence on the part of the defendant, to prove that the grant in question was a valid grant, according to the Spanish laws and practice in regard.to such official acts.
 

 On this singular record,, the case was argued before this court on thé 24th of February, 1845. The opinion of the court (3 Howard, 773) was against the validity of the grant, the judgment of the Circuit Court was reversed, and the cause was remanded to it “ for further proceedings to be had thereon in conformity with the opinion of the court.”
 

 In the argument of the case, reference was largely had to the documentary evidence improperly introduced into the record ; and the plaintiffs’ bills of exceptioñs, which alone were properly before the court, were scarcely adverted to.
 

 The opinion of the cohrt was put upon the fact, which it considered established by the testimony, that the certificate of Trudeau, or the
 
 plano figurativo,
 
 annexed to the grant, was antedated and fraudulent; and that therefore, if the grant itself was a genuine instrument, it had not
 
 “■
 
 the aid of an authentic survey to ascertain and fix the limits of the land, and to determine its location.” This opinion in regard to the genuineness of the certificate of Trudeau was thus expressed : —
 
 “
 
 After an attentive scrutiny and collation of the whole testimony, we think it is perfectly clear that this certificate of Trudeau is antedated and fraudulent; and we refer to the evidence of Filhiol, McLaughlin, and Pommier, as establishing .conclusively that the actual survey, upon which this certificate was made out, did not take- place until December, 1802, and January, 180¿); and that the one referred to by the governor in the paper of 1797 (the alleged grant) was for land in a different place, and higher up the Washita River. We are entirely convinced that the survey now produced was not made in the life-. time of the Marquis of- Maison Rouge, who died in 1799, but after his death, and at the instance of Louis Bouligny, who, ac
 
 *864
 
 cording to the laws of Louisiana, was what is there termed the forced heir of the Marquis; and that it was made in anticipation and expectation'of the cession of the country to the United States, the negotiations upon that subject being then actually pending, and the treaty of cession signed on the 30th of April, 1803. We see no reason to doubt the truth of the witnesses to whom we have referred. On the contrary, they áre supported by the testimony
 
 of
 
 other witnesses, and by various circumstances detailed-in the ieeord.”
 

 It will be seen from this opinion, that the judgment of the, reversal of this court was not founded upon any error of law presented in the bills , of exceptions in the record, nor even upon any facts stated in those bills of exceptions; but that it was purely a judgment on the facts of the case, different from that which was found by the- Circuit Court of Louisiana, sitting without a jury, and found mainly upon the old depositions of three witnesses, which are in, the appendix to Girod’s printed pamphlet. Neither in the judgment, nor in the opinion of the court, did I concur at that time..
 

 Upon the return of the record, with this opinion,, to the Circuit Court of Louisiana, on the 9th of May, 1845, the attorney of the United States moved that the case should be taken, up , for final decision. The attorney of the defendant, on the other hand, moved for a new trial, and prayed for a jury; and in an. affidavit, it was sternly urged upon the court, that, in the previous trial, the case had been prepared and conducted under the belief of the law being well settled, that, in a petitory action, in which neither party called for a jury, the finding- of the facts by the court would be considered by the Supreme Conrt as equivalent to a special verdict, and would not be reversed, except so far as they might be brought up by bills of exceptions. The affidavit then went onto show, not only that several witnesses, whose- testimony was not reduced to writing, had proved the genuineness of the certificate of Trudeau, and his unimpeachable official and private character, but that the very depositions of Pilhiol, McLaughlin, and Pommier, from which the Supreme Court took the facts on which it mainly relied, discarding from them the finding of the Circuit Court, were
 
 ex parte,
 
 and had been taken without notice to, or the knowledge of, the claimants under the Marquis of Maison Rouge. The affidavit then alleged that the defendants could again, prove before the jury, and corroborate with additional evidence, the facts which had been found by the court upon the former trial.
 

 The Circuit Court overruled the application, and ordered a final judgment to be entered for the United States, and against
 
 *865
 
 the defendant, regarding the judgment and opinion of the Supreme Court as a final one against the validity of the grant, and being commanded by its decree to “proceed according to that judgment and opinion.” To this judgment a general exception was taken, and the case came again before this court' on a writ of error, .and was argued at the last term, December 15th, 1847. This argument has not been reported, probably because no formal decree of reversal or affirmance was made. It embraced, however, an elaborate view of the whole course of proceeding which had occurred, and made it apparent, that, in the statement of the merits of the case in the previous opinion of the Supreme Court, great error had been committed in-the assertion of facts; and that, in rejecting the finding of the Circuit Court as conclusive evidence of the facts, and in. permitting an inquiry into errors of law not made the subject of bills of exceptions, there had been a deviation equally great
 
 from
 
 the well-settled decisions of this court.
 

 The suit was not, as this court admitted in its decision, “a controversy, in a court of equity, but in a court of law ; the petitory action brought by the United States in the Circuit-Court of Louisiana being in the nature of an action of ejectment.” ; 3 How. 787.
 

 No point has been more repeatedly and authoritatively settled, than that this court will not, upon a writ of error, revise or give judgment as to the facts, but takes them as found by the court below, and as they are. exhibited by the record. Penhallow
 
 v.
 
 Doane, 3 Dall. 102; Wiscart
 
 v.
 
 Dauchy, 3 Dall. 327; Jennings
 
 v.
 
 Thomas, 3 Dall. 336; Talbots. Seaman, 1 Cranch, 38; Faw
 
 v.
 
 Roberdeau, 3 Cranch, 177; Dunlop
 
 v.
 
 Munroe, 7 Cranch, 270; United States
 
 v.
 
 Casks of Wine, 1 Peters, 550.
 

 The case of Parsons
 
 v.
 
 Bedford, 3 Peters, 434, was, like the present, a petitory action, instituted in the' District Court of Louisiana, and brought for review to this court, on a writ of error and bill of exceptions. It differed in one respect, — the facts wére found by a jury. The parol evidence, however, had not been written or entered upon the record, although requested by the plaintiff. That refusal was made the ground of an exception. This court decided that it was no error, not merely because the refusal was not matter of error, but because,.“if the evidence were before the court, it would not be competent for them to revérse the judgment for any error in the verdict of the jury.”
 

 ..By the. Code of Practice of Louisiana, (Art. 494, 495,) which, under the act of 24th of May, 1824, (4 Stat. at Large, 63,) is also the law by which the courts of the United States aré governed, the decree of the Circuit Court upoq the facts
 
 *866
 
 was in all respects equivalent to the verdict óf a jury; and the principle thus established by this court would be equally applicable to it. It was so held in Parsons
 
 v.
 
 Armor, 3 Peters, 425, where the parties had waived the trial by jury, and the case was. brought up by writ of error, the court saying it was certainly not an attribute of that writ, according to the common law doctrine, to submit the testimony, as well as the law of the case, to the revision of the court.
 

 In the year 1842, the effect which-was to be given to- the judgment of the court in Louisiana, asserting a conclusion of facts where a jury had been waived, was deliberately considered in the case of Hyde
 
 v.
 
 Booraem, 16 Peters, 176. It was then conclusively settled by this court, that it. had no authority, pn a writ of error, to revise ■ the evidence which the Circuit Court had before it, or the interpretation they placed upon it, or the conclusions they drew from it. This court then said,— “ That is the province of the judge himself, if the trial by jury is waived, and it is submitted to his personal decision. If either party in the court below is. dissatisfied with the.ruling of-, the judge on a matter of law, that ruling shoúld be brought before this court by an appropriate exception, in the nature of a bill of exceptions, and should not be mixed up with his supposed conclusions on matters of fact.” In. the subsequént case of Phillips
 
 v.
 
 Preston, 5 Howard, 290, the point was treated as conclusively settled.
 

 It should,, then, have been taken in this case as established, that every thing which was matter of fact in this controversy had been fixed beyond question in this court by the judgment of the Circuit Court of Louisiana; and that no portion of the proceedings' of that court remained open for revision here, but “such rulings on matters of law as were' brought before-us by an appropriate exception, in the nature of a bill of exceptions.”
 

 No final opinion to this effect, was written by this court for publication in our reports after the argument at the last term. But such opinion was expressed unanimously by us in out consultation. And, in accordance with it, this court ordered, that “ the judgment rendered in this case at December term, 1844, (3 Howard,.788,) and all the' proceedings thereon and subsequent thereto, should be set aside and vacated, and the case, as it stood at the term aforesaid' previous to the said judgment, reinstated.” Under this last order, the case has been before us. .at the present term.
 

 The case has been argued, and in my opinion properly argued, by the counsel for the defendants in error, upon the correctness of the rulings of the Circuit Court on matters of law,
 
 *867
 
 stated in the bills of exceptions taken bv the United States, who are the plaintiffs in error.
 

 The judgment of the Circuit Court has established the fact, that the grant made by the Baron de Carondelet, as the governor of Louisiana, on the 20th of June, 1797, to the Marquis de Maison Rouge, was valid under the laws of the French and Spanish governments then prevailing in Louisiana, and consequently continued to be so by the treaty which ceded Louisiana to the United States. It has therefore been properly treated as a question which, under the decisions I have' referred to, cannot, upon this record, now properly come before this court.
 

 The validity of the grant must depend upon the genuineness of the instrument itself, and upon its sufficiency to give to the grantee a complete and formal title to the land mentioned in it, pursuant to the laws of Spain at the time it was .made. The ■ concurrence of these two facts is essential to the validity of the grant. It is therefore distinctly, but succinctly, affirmed in the judgment of the Circuit Court,' and must be taken to be established thereby. From the opinion of the Circuit Court, explaining its reasons for this judgment, it is apparent that both of these points were fully examined, proved, discussed, and decided upon. The assertion that the certificate of Trudeau to the
 
 plano figurativo
 
 has been' antedated, or is fraudulent, cannot be maintained. It rests solely ' upon evidence not worthy of credit, from the circumstances and manner, it has been introduced by Girod in his pamphlet, which is shown to have been contradicted, and which,- if it were necessary to sift it, would be found to present, intrinsic and abundant proof of . its own discrepancies and inconsistencies. That the grant is a complete and formal title to the land mentioned in it, pursuant to the laws of Spain, is also conclusively established. It depended on the laws and' usages of that government, on the performance of the necessary conditions, and, finally, on the recognition of the grant by the Spanish authorities as the complete and formal investment of the full ownership of the land embraced in it. All these were matters of fact susceptible of proof. That such proof was adduced, and, was sufficient, is an inference we aré bound to take from the finding of the court, as is shown by its judgment, to which they were necessary.. When we turn to the opinion which the Circuit Court,, has thought proper, though under no obligation to do so, to annex to its judgment, we find such wás explicitly the case. On each and every one of these points there was testimony in' tjie Circuit Court. On that testimony that court founded its decision, as a fact, .that the grant was a valid and complete one. It says, that the genuineness of the grant is “ conclusively .«stab-
 
 *868
 
 lished by the testimony of witnesses who were weft acquainted with the signature of. the Baron de Carondelet.” Of the evidence in Girod’s pamphlet, which alone impugned the genuineness of Trudeau’s
 
 plano figurativo
 
 annexed to the grant, the court says, — “ It is insufficient to counteract the force and effect of testimony emanating from persons who had equal, if not better, opportunities of acquiring a knowledge of the facts set forth.” Of the performance of the conditions of the grant, the court says, there was “ the most conclusive evidence that the conditions thereof, whatever they may have been, have been complied with.” And finally, in regard to the. Evidence which established it as a complete and formal title, the court says, it is what was usually termed in Louisiana, under the Spanish government, a
 
 titulo m forma,
 
 — a title in form, — as is shown by the testimony of Tessier, who was examined under a commission, and who, as the court observes, was officiating at the time as secretary in the land department. He proved, under oath, that such an instrument was “ such complete and perfect evidence of title as not to.require any other to validate or strengthen it.’
 

 The validity of the grant was therefore properly regarded as an established fact, not now open to argument, under the order of this court pursuant to which the case is now before us. . It has been so treated by the counsel of the defendants in error, without interposition or remark from the court/ And' therefore, as it is now made to form the principal, if not the sole, basis of the decision jHst expressed as that of the majority, it is a point upon which, in my. opinion, the counsel for the defendants have not had that hearing to which they are entitled, and which is necessary to a proper investigation of this important title. 'The points raised by the bills of exceptions taken by the United States are before this court on this writ of error, and they have been argued and may. be decided. It is otherwise with that of the validity of the grant.
 

 If the only persons to be affected by this decision were the defendants on the record, it seems to me it would be improper to make it under the circumstances I have stated. But it has been brought to the notice of this court, before its judgment has been pronounced, that an act of Congress was passed on the 17th of June, 1844, (5 Stat. at Large, 676,) the object of which was to biiqg in the best form, for final adjudication, those long unsealed titles in Louisiana, arising unde/ the governments which existed there before the cession ; and that, under this law, the heits of Henry Turner, who are claimants under the land grant to the. Marquis of Maison Rouge, but to a far larger extent of land than the quantity now in controversy, are at this time de
 
 *869
 
 fendants’in error in . this court, having been brought here by the United States, after having had a decree.-in their favor in the Circuit Court. These parties, by á formal motion,, have asked that our present decision, if the same shall go to affect the validity of the grant, may be postponed until they shall be heard. They have stated, and .the fact is so, that the record in their case was filed by thé United States only a few days before the argument in the present case, and has only been printed since, so that, without any fault or negligence of their own, they have been, unable to avail themselves of the rule of this court whiéh permits parties in subsequent cases involving the same questions to be heard when the case first in qrder is reached; that while the question and point of law, so far as regards the validity of the grant, are the same, the evidence ne-. •cessarjr to its fair and complete adjudication is much .more fully established in their record than in the confused and imperfect one now before us; and especially, that it presents the tes-, timony of numerous witnesses of the highest and most uninf-peachable character, which has never been submitted to this court, directly establishing the authenticity of the documents in question, as well as proving the practice, usages, and laws of the Spánish government in regard to their form and effect. . That in their case the facts were not found solely by the court. below, but that, their record exhibits the verdict of a jury, founded, in addition to other evidence, on the actual inspection, of the original documents, which affirms their authenticity and completion, and the perfectness of the title under them-. And. finally, that if, under these circumstances, , a decision shall now be made against the validity of the grant, it will.be made on imperfect evidence, while fuller evidence is on the records of this court awaiting its examination, and also in prejudication of the rights of parties coming here under the sanctioii of an act of Congress, who have not been guilty of any delay in presenting themselves before this-court, and who have been precluded from the benefit of the rule before alluded to by no fault of their oWn. Can we refuse with justice an application, to grunt which injures no one, to refuse which may be produp-. - tive of consequences the most serious,' and perhaps irreparable wrong.? . '
 

 Nor, in my opinion, aré these the only considerations which should have induced us to refrain from a hasty decision, with imperfect, evidence, on the validity of this grant. Pour years ago, we made a decision relying on this same imperfect record, which contained an assertion and statement of facts rested on evidence since acknowledged by us to have been illegal in itself, and which we now know is positively contradicted. If
 
 *870
 
 mis grant is fraudulent in its execution, or in effect is such, though genuine, as to give no title to those "who claim under it, it is our duty to say so. But that should only be done after the calmest consideration of all the testimony relating to it, ■whether in the record of this case or in that Of any other case on our calendar in which is involved the question of the validity of the grant. We ought not to have forgotten, that, in doing otherwise, we may affect the rights and' property of many of our citizens who have not been heard; that we shall controvert the .opinions formally expressed for almost .half a century by the board of commissioners who first- examined the title, by the officers of the general land-office, by the legislature of Louisiana, by committees of Congress, and by the Circuit Court of the United States, — all of whom, after investigation, have declared this grant to be valid, and which has never been said to be otherwise by any other tribunal than this court, when it gave its now recalled judgment, founded upon the depositions annexed to Girod’s pamphlet.
 

 If we examine the judgment of the Circuit Court now under review upon the principles that have been heretofore settled by this court, we shall- find no error in the
 
 “
 
 rulings of the judge in a matter of law brought before this court by an appropriate exception in the nature of a bill of exceptions.” Hyde
 
 v.
 
 Booraem, 16 Peters, 176.
 

 In regard to the three bills of exceptions which were taken by the defendants, also in the record, we need not say any thing, because they are not properly before us, and have not been referred, to in the argument. But it may hot be amiss to remark, that they afford another reason why a final judgment should not now. be entered against the defendants, though the decision of a majority of the court may be adverse to them, because they allege the rejection of important testimony in their favor in respect to the validity of-the grant, for reasons which, without expressing a conclusive opinion upon them, I may say were strongly and plausibly urged.
 

 Let us now examine the bills of exceptions taken in behalf of the United States, to see whether they present any illegal ruling of the Circuit Court.
 

 They are five in number, but the first, fourth, and fifth have been properly and candidly conceded by the Attorney-General to be untenable. I am to remark, then, upon the second and third.
 

 The second is an exception to thg. admission in evidence of a petition of Daniel Clark, the grantor of the defendant, to the Intendant Morales, on the 1st of August, 1^03,. together with the alleged copy of a certificate, purporting to be signed by Leon
 
 *871
 
 ard and Amirez, tffficers of the royal treasury in Louisiana, on the 5th of August 1803, in which it was declared, that the .Marquis of Maison Rouge had complied virtually with the terms of his contract. The signatures are-certified by a notary to be known to him as genuine, and both papers appear to be part of the same “instrument.” The genuineness of the signatures was not denied by the Attorney-General. The only ground taken in the argument .to sustain the exception was, the insufficiency óf the testimony to prove a compliance by Maison Rouge with the conditions of the grant. It is certainly no valid objection to the admission of an authentic document as testimony, that it does not prove all for which the party offering it contends. This may affect its sufficiency, not the legality of its admission. It is a document from the Spanish archives, the authenticity of which was proved, as well as the removal of the records themselves, many years ago, by the Spanish authorities. Its admission is clearly within the rule established in the case of The United States
 
 v.-
 
 Wiggins, 14 Peters, 345. The exception is limited to the admission of the evidence, not to the legal effect which has been or may be given to it, and it cannot be doubted that the decision of the Circuit Court to admit it was correct.
 

 The plaintiffs’ third bill of exceptions was also' an objection to the admission of documentary evidence, namely, the report of the commissioners appointed under the act of the 3d of March, 1807, declaring that the grant to the Marquis Maison Rouge “ is a patent, or what in Louisiana was denominated a title in form, transferring to him the title, in as full and ample a manner as lands were usually granted by the Spanish government, subject, however, to the conditions stipulated in his contract with the government.” That such a report was made, and that the document in question was a copy, of it, was not disputed.^ Such an official act of the officers of the United States in regard to the title was certainly legal evidence in the chain of proceeding, whatever its bearing and effect upon the validity of the title may be. But, if this were not so, it will be enough to say, to dispose of this exception, that, in the course of the trial, another copy of this same document was introduced in evidence on the part of the United States.
 

 These are the only exceptions to the judgment of the Circuit Court which .were taken at the trial, and which have been brought before this court in this record. Neither can be sustained ; nor do the majority of the court, in the opinion read by the chief justice, attempt to sustain them..
 

 What, then, is there in the record, upon which. the majority of the court rely to warrant their judgment ?
 

 
 *872
 
 It has been argiied, on the part of the United Statés, that there are errors apparent on the face of the record, which, though not made, the subjects of exception, will. be noticed by this court. These errors are' said to be in the judgment itself. That judgment is in the following w;ords: —
 

 .“ The court having maturely considered the law and the evidence in this case, doth now order, adjudge, and decree, that .the plaintiffs’ petition be dismissed; and that the-grant made by the Baron de Carondelet, as the governor of Louisiana, on the 20th June, 1797, to the Marquis de Maison $ouge, be, and the same is hereby, declared valid; that the said Richard King, defendant, and the said Daniel W. Coxe, the wárrantor, be, and they, are hereby, declared and recognized to be the lawful owners of the' parts of the said grants held by them, as described in the • answer of the said' Richard King, and in .■Scheduté A, and that they be quieted in the ownership and possession of the Same.”
 

 .In this judgment, three patent errors are alleged to exist. It is- said that it adjudicates the title for lands for which the United States have not sued; that «the acceptance, by the defendant Coxe, of a league square, was an extinguishment of his claim to any other portion of the land; and that which was principally argued and urged was, that “the instrument executed by the Baron de Carondelet, On the 20th June, 1797, was not a grant to the Marquis de Maison Rouge.”. These errors are alleged to be apparent on the record, independently of any exception embracing them. None- such, it is- admitted, were taken in the. court below," or brought here.
 

 Admitting, for the purposes of this argument, that- this court can reverse a judgment for such an irregularity, as is said to be in this, in its adjudication of the title for lands for .which the United States have not sued, without, however, conceding it - as,a fact that this court can properly do so, in a case brought to it upon.a writ of error, this is not the case for the. exercise, of such a power. -
 

 The court" having decreed thát the petition of the United States should .be. dismissed, and that the defendant King should - be quieted in the ownership .and possession of that land for which the United States sued, is as “ définitivé a sentence,’,’ or judgment, as tlje court could have given upon the subject-matter of the suit. It put an end to the suit, and absolved thé defendant, in the languagé of the civil law of Spain, from the demand which’ had been made or suéd for.. Any thing put with it, growing out of the mode of proceeding in the trial, but separable "from that “sentence,” so as not to interfere with its execution, is,.in the . civil law of Spain under which the
 
 *873
 
 judgment was given, one of those divisions. or points
 
 (capí-tulos)
 
 which can be appealed from, and set aside upon the appeal to a superior court, or by the court giving the “ sentence,” on account of its comprehending a thing not demanded or prayed for. But not so when the defendant has been acquitted and declared free from the demand, unless a right to revoke the sentence has been reserved by the judge (L. 9, tit. 22, p. 3); though it may be reversed upon appeal in a superior court, for meritorious cause, when there has been error in the judge in acquitting the defendant from the demand for which he was sued. It cannot be denied, that, in this case, the “sentence” or judgment is conformable to the proceedings, so far as it' acquits the defendant from the demand of the United States. The
 
 jus in re,
 
 or dominion in the thing sued for by the United States,-is for so much land, particularly describéd in the action, as the mode of . proceeding in Louisiana, or the civil law of Spain, in this particular still existing in Louisiana, requires to be done, with a recital — proper enough, and admissible in such actions, but not necessary — of a survey by Dinsmore, without authority of the plaintiffs, under an alleged pretended claim,
 
 “
 
 called the Maison Rouge claim.” The answer of the defendant, after a general denial of all and singular the allegations in the petition, except as they are thereafter speciálly admitted, is, that “ he-is the trite and lawful owner of the tract of land described in the petition,” with a recital of his purchase from Coxe; that he is in possession of the same, and has made valuable improvements; with a prayer that he may be dismissed with costs, and that Coxe, as his warrantor, may be called to appear and defend him in the suit. The issue, then, according to the Louisiana mode of-proceeding, or the civil law of. Spain, between the United States and King,, was certain, positive, and respondent upon the part of King to what the United States sued for, and is no way changed by the intervention of Coxe as his warrantor. That makes another issue between Coxe and King, so far as his denial of King’s state ment of his warranty to him; but it is not a substitute for thí .first issue between the United States and King, as to the dominion Of the land sued for. Coxe, it is true, comes in upon the prayer of King, to defend the suit as his warrantor; not, though, as the court here seems to suppose, exclusively to maintain King’s ownership of the land sued for as a part of the Maison Rouge grant;' for in this petitory action by the United States, King might have resisted it by any equitable title other than that which was equitable or legal connected with that grant. But King asks, that Coxe may be brought in as a party; that, “if this suit should be decided against him, he
 
 *874
 
 may have judgment against the United States, and the said Coxe, for the value of his improvements on the land, arid a judgment against Coxe for the purchase-money and interest thereon, from the time of eviction,” and costs, of suit. In such a case, no error or irregularity in the judgment, in respect to Coxe’s answer, can invalidate the finding ■ upon the answer of King, if the latter can be executed upon the thing sued for. In other words, theré may be in the civil law of Spain,-upon which the rights of the parties in this case exclusively depend, distinct findings in the same judgment, without the error of one of them having the effect to vacate the other; and -m, that, case it often happens that one of the findings in the judgment is made the subject of appeal, and that it is reversed without affecting the other.' Now, though this may not be done in our writ of error, what I contend for is, that, if, in a writ of error in a case from Louisiana, a judgment shall have distinct findings, one of them expressly comprehending and adjudging the subject-matter of the suit, we. shall sepárate it from the others , which we may think cannot be maintained, and affirm the first, as would be done in the court,s of Louisiana, when the subject-matter of rights claimed and denied depends upon the Louisiana law, or upon that law which existed there when the parties to the suit respectively acquired their rights in the subject-matter of the suit.
 

 But further, the language of the judgment, as to the land iipon which it is to operate, is explicit. It dismisses the petition of the United States, and quiets the defendant in the pos-, session of precisely, that land, in quantity and description, for which the United States sued him. Whether it was or was not the intention of the Circuit Court to adjudicate the' title to .other lands, in which the defendant King has no interest, but to which his warrantor, Coxe, may have a title, is of no consequence, for both are so discriminated in the judgment that they cannot be confounded; and were so, that each, might be independent of the other, or, in the language of the civil law of Spain, be firm and valid, from having passed into a thing adjúdged
 
 {cosa juzgada).
 
 Besides, such adjudication of a thing not sued for cannot vitiate the judgment for the thing that is sued for in this case; for, if the former.is not valid only because it is- for land, as this court says, not sued for, the other part of the judgment in favor of King is valid, it being for the very land which was sued for. The fact that King and Coxe claim dominion of parts of what they say they 'respectively own, under the same grant, and that the court affirms their rights under it, cannot render that part of the judgment in favor of King, less a judgment, because it is for a thing in con-
 
 *875
 
 testation; and, though a part of the Maison Rouge grant, the whole of that grant never was so. It was neither so by the action brought by the United States against King, nor did it become so from the answer, of Coxe,- though that answer, as well as the answer of King, raised the question of the validity of that grant, for the purpose of having it judicially determined whether or not it gave to King the dominion of the land for . which the United States sued him, as a part of the Maison. Rouge survey. To so much of that land or survey, and to no more of it, is the judgment in favor of King an affirmation of his ownership, or of Coxe’s right of alienation of it to King. A judicial determination in favor of the validity of. the grant and survey, for any portion of the latter, is a good, reason for the United States, by its proper functionaries, to consider that the land embraced in the survey was private property when Louisiana was ceded, or that it was not a part of the public land intended to be conveyed by the treaty to the United States. But the validity of the grant was not, nor can.it be, as the case is in the record, the foundation for a judgment in favor of Coxe for' all the land which he claims .under it, because the United States had not submitted to the jurisdiction of the court for any such'purpose. A “definitive sentence,” or judgment, is only valid .when it is given against a person subject to the jurisdiction of the judge. (LI. 12, 15, tit. 22, p. 3.) But the United States did submit itself to the jurisdiction of the court, for the land for which it sued King ; and the judgment acquitting him of that demand is final and conclusive in his favor against the United States, though it may be reversed for error in itself by this court, upon a .proper exception, and though the execution of it is suspended by the cognizance which.this court is legislatively empowered to take of that “ sentence ” or judgment. I say legislatively empowered, for that phrase indicates the extent and boundary of this court’s cognizance of a case in error. Until it shall be enlarged by Congress, I must think that the court has exceeded it, in this instance, by making an erroneous “division or point,” in a judicial sentence containing two distinct “ divisions or points,” the foundation for the reversal of both, and that, too, without an exception having been taken in the court below to either of them, to bring one or the other of them up for concurrence in this court. If this court means to claim the power, and to exercise it in the review of a judgment, by a superior court, of. an inferior, according to the civil Roman law, or as that law was modified under the Spanish rule in Louisiana, it may be done.' But, in doing it in this case,'I ma^ be allowed to dissent from my brethren, until some better
 
 *876
 
 reasons for the exercise of such power shall bé given than I have yet. heard.
 

 However, does the language of the judgment necessarily embrace any. other land than that which the United States claim in their petition ? • The inquiry should not alone be, whether the judgment may not bear that construction, but whether or not- it does not admit of another, more coincident with the case as it is on the record and appeared to be on the trial, and more ■in harmony with the duty of the judge who gave it,' in respect to the only “definitive.sentence’’ -which, under the civil law , hf Spain as it exists in Louisiana, can be given in a suit for real property where a warrantor appears to defend the respondent .to .the. action in the character of a plaintiff in reconvention. If the judgment will bear such a construction, though the language of it may not obviously show it, we are bound to give • that, of which it is susceptible, most favorable to its operative • accuracy, or “ executive process for a thing adjudged.” Now my reading of this judgment is, that the petition of the United States is dismissed, and that King is quieted in the ownership and possession, of the quantity of land for which the United States, sued’ him, on account of the court having found the fact óf the validity of the Maison Rouge grant, and that the further declaration in the judgment in respect to Coxe’s ownership of the other, lands in Schedule A, and that he is to be quieted in the enjoyment of them, is but an inference from the court’s finding, from the proofs in the case, that the Maison Rouge grant and survey were valid.. That it could not have been the intention of the.court to be a judicial sentence seems, to me certain,— first, because the court had disallowed or dismissed Coxe’s plea in reconvéntion, by which alone his title to other lands than that sued for was brought in question, and secondly, because the.only judgments which the Louisiana law permits’to be given in such a case are the affirmation of his title to the land by decreeing its ownership to his vendee, or the -disáffirmation of it, with a sentence against the warrantor for the purchase-money, with interest upon it from the final eviction, and for the value of the improvements and costs. Besides, in all fairness of construction, if we consider the words of the judgment in connection with what, manifestly, the Circuit Court, throughout the trialj thought was the only issue before it, do the words, “ that the said Richard King, and the said Daniel W. Coxe, warrantor, be, and they are. hereby, declared and recognized to be the lawful owners of the parts of said grant held by them, as described in the answer of the said Richard King and in the Schedule A,” imply an adjudication for more land than that for which King had been sued, and of which Coxe had been.the owner, as
 
 *877
 
 described in the schedule, before he sold it to King ? Of themselves, the words may; but that it was not so meant seems to me to be certain, from the dismission of the petition of the United States for just the land for which it had sued. I have used this course of argument, however, in respect to the judgment, not so much for the purpose of establishing the correctness of my own' construction of it, as to show, that, in this court’s review of it, instead of doing as it has done, it should, in accordance with its own well-established rule, havé made every reasonablé presumption in favor of its correctness. So the court has done in all previous cases where that which- was equivocal in a judgment has not interfered with the right, to a forced execution upon it of the matter in controversy. And so essential is the propriety and policy, in jurisprudence, .of putting an end to further controversy after- a judgment rendered, though there may be surplusage in it, that no instance can be found in our books, nor in the English reports, of a judgment set aside,, in a court of.review, which distinctly finds the issue between the parties, on account of other matter, in it, unless upon exceptions taken to the court’s ruling of the law in the case applicable to the issue. This I believe to be the only instance to the contrary, and I cannot think it will everbe a precedent for another.
 

 ■ In the case under consideration, the action was instituted by The United States against King, for the recovery of a tract of land" in the actual occupation of the ■ defendant.' The petition is in the general terms in which such pleadings are usually framed in Louisiana, and avers the invalidity of the title under which the defendant claims to hold the land, and the para-mount legal title of the United States. The answer of the defendant to this petition is equally general in its terms, and asserts, without any specification of details, the validity of his title, and controverts the allegations in the petition. So far the case is perféctly simple, and, being.followed by a general judgment for the defendant, so far as that judgment disaffirms the title of the United States and affirms that of the defendant, there is no ground upon which error can be alleged. In such a state of the case, without the intervention of the warrantor, I am warranted in saying, from the decision just read by the chief jus- • rice, that the judgment of this court would have been in favor of the judgmént of the Circuit Court. The supposed difficulty, however, which the case presents, and which has caused the reversal of.the judgment. of the-Circuit Court, arises from the circumstance, that King not only puts distinctly and simply in issue the question of title between himself and the United States, but he vouches, in warranty, Coxe, from whom, he
 
 *878
 
 chased. King was, by the practice in Louisiana-, obliged to do that. Let us for a moment inquire into the nature of that practice, and what'it is meant to accomplish. In my opinion, it has a decisive and hostile bearing against the ground taken by this court, that the judgment of the Circuit Court should be reversed on account of its supposed adjudication of title for more land than the United States sued for.
 

 At common law, as is fámiliar to all of us, when an action is brought to recover real estate which a defendant holds by purchase from another, accompanied with'a-covenant-of warranty, the defendant may, at his option, elect either to give notice of the pending action to his vendor and warrantor, or to await the result of the suit, and, if judgment passes against him, sue upon his covenant of warranty. In the first case, the warrantor may take upon himself the burden of the'defencé;if he pleases, or may omit it. In either case, notice of the suit having been given to him, he is bound by the judgment. It' is, nevertheless, still necessary that an action upon the warranty should be brought against him to enforce his personal liability. And upon proof that he had notice of the first suit, the judgment against -his vendee will be conclusive evidence against him of the breach of his covenant.
 

 If no such notice of the first suit be given to him, he may, in an action on the covenant, controvert the title of the original plaintiff, and require full proof of it to fix his liability. In all cases, however, the responsibility of the warrantor is judicially settled in the second suit.
 

 The Louisiana law seeks' to accomplish precisely the same results by a speedier process. It permits the defendant to call, in warranty, the party from whom he derives title. The war-rantor may forthwith appear in court as a party, and in his own name defend the suit. Notwithstanding this, however, no judgment is entered against him at the suit of the original plaintiff; but in case he shall be adjudged entitled to the property in contestation, a second judgment is entered simultaneously, in favor of the original defendant, against his warrantor.
 

 This subject was fully discussed in this case at our last term ; but, as I have remarked before, we have no report either of the argument or the decision. I depend upon my own notes of. that argument; and upon those, of Mr. Coxe, of counsel in the case, from which I have derived much information. In my view, however, of the Louisiana law and practice, it is clear that the original proceedings and pleadings between the original parties to the suit remain as they were before the intervention of- the warrantor, and the defence interposed by the warrantor cannot be made the foundation of any judgment to be rendered in favor of the*plaintiff in the original' action.
 

 
 *879
 
 If this view of the matter be correct, in giving judgment in favor of King against the United States, the Circuit Court was necessarily limited to the. pleadings between the parties. And so this court regarded the question at the last term; for although Coxe, in the defence interposed by him, sets up a claim to a larger portion of the entire Maison Rojige grant, and although this court, when this case first cante before it, considered that, the controversy was thus enlarged--so as to comprehend this addition to the subject-matter involved, and that Coxe became answerable to a judgment coextensive with his claim,' yet we were .all satisfied, at the last term, that in this we had, as in other respects, misapprehended the local law, and the majority of the court now — as it ought to have done before, as I then thought — have confined us within our legitimate limits, and restricted the judgment to King alone, and to. the property described in the petition. It would seem necessarily to follow, from this view of the case, that, in our consideration of the judgment of the Circuit Court, we ought to be restricted to the matters put in issue by the pleadings between the original parties.
 

 In this aspect of the case, the grounds upon which the present decision is made to rest, in the opinion of the court, are wholly dehors the record.
 

 Be this, however, as it may, this point in the case, so vital in the vievv taken by the majority of the court, has not been argued by counsel-on either side. Nor'is it considered distinctly and independently in the opinion of the court. In the absence of both, I am not disposed to pass any definite judgment. It is a point, however, which must be surmounted or avoided to warrant the judgment just given by this court.
 

 But it is said that Coxé’s acceptance of a league square was an extinguishment to any other portion of the land, and that there - was error because it is not so declared in the judgment. This is certainly a matter dehors the record. , Nothing concerning it is either on the face of the judgment or in the bills of exceptions. It is not in any way before this court, by any principle or rule of practice known to this court or any other court having the power to reverse, upon writs of error, the judgments of inferior courts.Some correspondence in regard to it is found, like Girod’s pamphlet, in the mass of documents improperly sent up with the record; but we have no means of knowing whether- or not it is the whole of the correspondence. I repeat, we cannot consider it by any known rule of judicial proceeding. Suppose it, however, to be before us for examination: can it. be contended that the acceptance of this league square by Mr. Coxe was an extinguishment of his claim to the rest of the land in
 
 *880
 
 the grant, if that were otherwise valid, or that it annulled the conveyance to King made by Coxe long before the patent for the league square ? The act of Congress' of the 29th of April, 1816, confirmed all claims recognized as complete grants in the report of the commissioners appointed under the act of the-3d of March,' 1807, and authorized a patent to be issued therefor; and the Maison Rouge claim had been so recognized and reported; but it was provided that under “ no one claim shall any person or persons be entitled, under this act, to more than the quantity contained in a league square.” Had no stipulation been made with ’Mr. Coxe when he received this patent, his right to any further quantity would not, by the language of this law, have been lessened or impaired. It did not, nor was it meant to, impair the quantity assumed by the United States in the treaty of cession of Louisiana, by which all the inhabitants were protected and maintained in the enjoyment of their whole property. And if it had been so meant, I do not think that I venture any thing which will not be acquiesced in' by my associates in this court,’' when the subject shall- be- fully examined, in saying, that Congress cannot constitutionally pass an act taking from the inhabitants of Louisiana,' or those of any. other purchased territory now making a part.of the United States, any property guarantied to them, their descendants or assigns,' by. treaty, so as to exclude, them from having their rights to the whole of what they claim judicially ascertained. A treaty is the supreme law of the land, and. it limits the legislation- of Cóngréss to the fulfilment- of all of its provisions, to the fullest extent of them,,and not for less or a part of what individuals have a right to claim' under it as property, but for the whole. And what that whole may be, where there is. a dispute about it between the United States and those claiming, can only, under our system, be judicially ascertained and determined, unless, by the- treaty or by the consent of the. claimants, 'some other mode of detérmining the righit has been agreed upon. But if this were not so, in this case there cannot be a doubt; for before Coxe accepted the patent for a league square, -he made an inquiry what effect his ácceptance would have upon his claim, -and he was assured at the general land-office, acting under the in-structions of the Attorney-General, that.it did not preclude him from seekihg the recognition or confirmation, of his entire claim by Congress or the courts ;of the country.-
 

 I will now consider, as briefly as I can, the only other error assigned by the majority of the court on this judgment. It is, that the Circuit Court-adjudicated- the instrument executed by the Baron de- Carondelet, on the 20th Jtine, 1797, to be a grant to the Marquis de Maison Rouge. -This is surely- not an
 
 *881
 
 error brought before this court by a proper exception, and more, it is not an error apparent upon the record. It not only is'not in any bill of exceptions, but it is not a ruling of the Circuit Court which was-at any time formally objected to, directly or indirectly, in the court below. If it is an error, it exists in the language and office of the judgment itsélf, —■ noAvhere else.
 

 Accurately speaking, this is not the judgment of the Circuit Court upon the issue made and submitted by the pleadings. It is the reason or cause assigned for the judgment. The prayer in the petition ,of the United States is, that they may “ be decreed, by a judgment of this honorable court, to be the true and lawful owners of the aforesaid land and premises.” The judgment responsive to this prayer is, that “ King, the defendant, and Coxe, the warrantor, are declared and recognized to be the lawful owners,” and are to be quieted in the ownership and possession of the same. The portion, therefore, of the decree now excepted to is a reason of the court for rendering such judgment. It is no necessary part of the issue submitted for adjudication, or of the judgment actually given. . As a reason of the court, it is mere surplusage,-and can be altogether rejected without affecting the validity of the judgment. It is well settled, that, if a judgment be defective in form, yet if it follows and is responsive to the issue, and is substantially right in that respect, neither such defect, nor any surplusage contained in it, is a ground for error. Moore
 
 v.
 
 Tracey, 13 Wend. 282; Buckfield
 
 v.
 
 Gorham, 6 Mass. 447; Brown
 
 v.
 
 Chase, 4 Mass. 436; Deering
 
 v.
 
 Halbert, 2 Littell, 292; Todd
 
 v.
 
 Potter, 1 Day, 238. In Louisiana, in the case of Keene
 
 v.
 
 McDonough, 8 Louisiana, 187, it is said, “ An erroneous reason, given in a judgment which is correct in itself, is no ground for reversal.” In any event, the reasoning of the court on which it either partially or wholly .puts its judgment, even if incorrect, can only form the ground of an exception to be submitted to the court below; and if- there persisted in, must be made the foundation of a bill of exceptions to be revised by this court. No exception whatever was taken to this portion of the judgment or reasoning of the Circuit Court.
 

 If, however, the declaration, or decree embraced in the judgment, is an essential and necessary part of it, can it be revised by this court ? It is the assertion of a fact, depending exclusively upon the performance by the grantee of the conditions of the grant, and upon the laws and usages of Spain, in; cases where such instruments were issued and such conditions performed. Whether or not this fact was established is, as I have already shown, a matter belonging to the Circuit Court exclusively to decide. That court had before it the evidence of the performance of the conditions of the grant, and of the laws
 
 *882
 
 anil uságes of Spain in regard to it. We have not. Nay, more, we are bound to presume that • this judgment was right, so far as it did or could, by any possibility, depend upon a matter of fact. Every matter of fact necessary to sustain it will be presumed to have been proved, and will be taken by this court to have been fully proved in the Circuit Court. This is a prinpi-ple too well settled, alike by the common law and the law of Louisiana, to need discussion. Campbell
 
 v.
 
 Patterson, 7 Vermont, 89; Butler
 
 v.
 
 Despalir, 12 Martin, 304; Mitchell
 
 v.
 
 White, 6 New Series, 409; Hill
 
 v.
 
 Tuzzine, 1 New Series, 599; Piedras
 
 v.
 
 Milne, 2 New Series, 537, also 265; Miller
 
 v.
 
 Whittier, 6 Louisiana, 72; Love
 
 v.
 
 Banks, 3 Louisiana, 481.
 

 And in the case of Carroll
 
 v.
 
 Peake, 1 Peters, 18, this court said, in the absence of proof to the contrary, if any possible state of the case can be imagined, or any amount of testimony supposed, necessary to sustain the opinion of the Circuit Court, this court will assume that such .a state of the case existed, and that such evidence was offered on the trial. ■ Whether or not this is a complete “title in form "under the'Spanish law, as it existed in 1797, and whether the conditions contained in it.(supposing the performance of them to be necessary to its validity) were performed, are purely matters of fact, depending upon evidence which was before- the Circuit Court. We ought, and .are bound, to presume they were legally and conclusively éstablished by that evidence. If so, the decree and judgment of the Circuit Court were free from error, and should be so affirmed by this tribunal.
 

 I think I may say, that no errof assigned, either in the record or by a majority of,this court, in behalf of the United States, has been sustained. In my opinion, if the case could be justly decided now,' a judgment of affirmance should be entered. I wish sincerely that I could, consistently with what I have felt myself bound to do, close my remarks upon the course pursued by a majority of. the court in this case with what I have said. Something remains to be done.
 

 In the opinion expressed by the majority of the court, they have deeméd it proper to discuss the validity of the • Maison Rouge grant, as if it were not affected in any way by the facts ascertained in the judgment of the court below, and as if in ‘every aspect, whether of fact as to the performance of the condition, or of legal effect according to the law and usages of Spain, its validity was here before us for examination and adjudication. This course I deem at variance with the settled law and practice of this court. But as I regard the grant to be clearly valid, and the opinion now given by the majority of this court against it as of the highest importance to one of the States
 
 *883
 
 of this Union, and to a large portion of its people, I will submit the grounds on which I think that the Circuit' Court in Louisiana properly adjudged the grant of the 20th June, 1797, to'the Marquis de Maison Rouge, to be valid, legal, and complete.
 

 Under.the royal order of the 24th August, 1774, the governor of Louisiana had the amplest powers to grant lands, without limitation as to quantity, arid without the necessity of a confirmation by the Spanish government.' This power existed undiminished until the royal order of 22d October, 1798, when it was conferred on the Intendant. 2 White’s New Recopilacion, 245; United States
 
 v.
 
 Arredondo, 6 Peters, 727; United States
 
 v.
 
 Clarke, 8 Peters, 452.
 

 After the treaty of -the 17th October, 1795, between, the United States and; Spain, by which the latter government relinquished its claim to the territory on the eastern side of the Mississippi north of the 31st degree of latitude, so that the settlements of the United States were rapidly approaching the inhabited portions of Louisiana, it became, even more than had been previously the case, an object of Spanish policy to promote the establishment of colonies of European emigrants on the outposts of Louisiana, and to encourage the. cultivation of wheat, so as to supply its inhabitants, and make them independent of the people of the United States for that food. ■ At no period "of Spanish colonization was the disposal of the public lands a source of revenue, as ours have been in the United States. Conditions of settlement on the performance of other stipulations were imposed, but in no instance was the payment of money exacted, except in a few cases in Florida, where grants of land were permitted by the king to be made by the Indians to individuals for depredations upon the latter. But money for the king’s revenue, or for colonial purposes, was never exacted in payment for land's granted. The land granted was usually limited in quantity, bu.t varied according to the objects for which the grant was made. Several ‘ cases determined in this court exhibit the ratification by it of grants made by the Spanish governors of Florida' and- Louisiana, from a few acres to hundreds of thousands of acres. ■ Every kind of consideration for them is also exhibited. Sometimes the settlement and cultivation by the grantee himself; sometimes by settlers to be introduced by him; at other, times, the construction of mills, or the establishment of large 'grazing farms; again, a reward for military services; sometimes -the liquidation and settlement of previously existing contracts. -Of all these considerations, and of many -others, which were-the foundation of grants of land by the Spanish governor, thé records of this court afford ample evidence.
 

 
 *884
 
 In this state of the country, and under that system of policy, the Spanish governor, Carondelet, máde a contract on the 17th of March, 1795, with the Marquis de Maison Rouge, a French emigrant, then lately arrived in the colony. The object of it was to establish a colony of European immigrants on the Washi-ta River, to cultivate wheat, and to erect mills for manufacturing flour. The Spanish government agreed to pay in money two hundred dollars for every family of two persons, four hundred for those having four laborers, and one hundred for those1 having one useful laborer. It also agreed to facilitate their passage, to'.the place of settlement, supply them with provisions, to pay for the transportation of them and their luggage, when they came by sea to New Orleans, and. to. grant to every family containing two white persons fit ¡for. agricúlture four hundred arpens of land, and a. corresponding proportion for more or less. In the outset, the number of families was limited to thirty.
 

 The contract of March, 1795, was designed to .be the beginning of a national policy deemed by the Spanish government, and its representatives in Louisiana, essential to the independence of that province, and to the preservation of other territories of Spain still farther south.' The government, therefore, undertook to defray-all the expenses of its commencement, knowing that, after the settlement of thirty families in a wilderness,, others would be induced .to migrate to it, paying their own way, on account of that security which first settlers always give to new lands. The Marquis de Maison Rouge stipulated for nothing to be performed on his part but the introduction of thirty emigrant families into the province. • Evéry. other term of the agreement is to be performed by the Spanish government. The inspection of it, at pages 58 and 103 of the record, will, show that all the onerous stipulations were on the part of the Spanish authorities’, but none of them could in any way, or -by any' construction of it, result in any, pecuniary gain to Maison Rouge. Guides, and provisions, expenses of transportation, and grants of land and money, were to be furnished,given, paid, and made to the emigrants. Not a dollar was to be paid to the Marquis. The contract does not give him an acre of land. Not the smallest benefit from it was to come to him.
 

 The Intendant, Morales, a man of vigorous' character,. and strict in his administration of the colonial finances, did not approve of the Baron de Carqndelet’s mode' of colonization in his contract with Maison Rouge, on account, óf the expenditures to which it led; but at the same time he expresses his opinion, that it was the policy of the Spanish government to “ have an extensive settlement on the Washita, to protect the possession
 
 *885
 
 of the kingdom of Mexico.” But Carondelet’s contract with Mais'on Rouge, for the settlement of the thirty families, had received the royal sanction as early as July, 1795. The burden of it, except so far as the services of the Marquis ,had aided in its accomplishment, had fallen on the Spanish government. The literal compliance with it had been nearly fulfilled by the settlement of the thirty families, and the importance of the extension of such settlements became more apparent after two years had passed, as Morales ackriowledged, than it had been when the policy was first adopted. It was then that the Baron de Carondelet recollected the unrewarded services of. Maison Rouge, — that he was a noble
 
 emigré,
 
 impoverished and driven from France by the Revolution, —- and, no doubt, excited by the success of his policy, in his first experiment in colonizing the Washita under the personal agency of the Marquis, determined to extend it, by making a large grant of land to him; which policy he was to carry out on his own account, at his own expense, and for his. own benefit. The language of the grant is, “ Forasmuch as the Marquis de Maison Rouge is near completing the establishment of the Washita, which he was authorized to make for thirty'families by the royal order of July 14th, 1795, and desirous to remove, for the future, all doubt respecting other families or new colonists who may come tb establish themselves, we destine and appropriate conclusively-for the ,establishment of the aforesaid Marquis de Maison Rouge, by virtue of the powers granted us by the king, the thirty superficial leagues marked in the plan annexed to the head' of this instrument, with the limits and boundaries-designated, with bur approbation, by the surveyor, Don Carlos Lareau Trudeau, under the terms stipulated and cohtracted for by the said Marquis de-Maison Rouge.” This grant was made on the 20th June; 1797, eleven days after the letter of the 9th June from Morales to the Marquis de Maison Rouge, (record, p. 24,) in which the Intendant, after refusing to alter ,a previous decision concerning the payment of money to some of the Marquis’s emigrants, under the contract of 1795, says,.— “I doubt not that your intentions,are the best for the interest of my august'sovereign that with this object, besides the- convenience of living.under his wise laws, you formed- your plan, and I cannot disguise my belief, that it Would be very, useful for Spain to plant.an extensive settlement on the Washita, to protect the possession of the kingdom of Mexico; but I cannot admit, with all his reasoning, that your project will be the best and most advantageous to effect that purpose
 
 ;
 
 far from it. I entertain the opinion, that, if the government desire to benefit .by the present circumstances, they can accomplish their ends
 
 *886
 
 without great expense.” It may be reasonably concluded, that the extract from the letter of Morales was in reply to one fiom Maison Rouge, concerning the contract of 1795. The internal evidence warrants such an inference. And, as it shows a difference of opinion between the Intendant, and the Baron de Carondelet concerning the mode of colonization, and the disapproval by the former of the manner in which the latter had carried out that policy in his contract with Maison Rouge, — both of them, however, acknowledging the wisdom and necessity of such policy, though differing upon whom the expense of it should fall, — we have the motives and the reason for Ca-rondelet’s grant to. the Marquis. Further, the grant in quantity, two hundred thousand arpens, was not more than enough for five hundred families, at the rate of allowance fixed by the contract of 1795. It could only, become valuable to the Marquis. by being colonized by him. The. general policy ‘on which it was made justifies the extent of the grant, and shows the strong desire of the government to extend and promote these ttlement on the Washita, without incurring the expense of the previous arrangement. It was well known, before the contract of 1795 was made with Maison Rouge, and from the execution of it by him, that settlers could not be induced to fix their residences in such a wilderness then, without gratuities of land and money, and their transportation being paid. These weye to be borne, therefore, by the Marquis. It is not at all improbable, if his life had been spared to carry out his design, that the cost of it would have left him bufa small part of what at first seems, from the magnitude of the grant, to be a principality. Time only has ever repaid the actual cost of colonization; but individual settlers in new countries, when not disturbed by wars, or destroyed by savages, have commonly gathered-fruits for themselves and for their posterity. Still, the grant was • an inducement for the Marquis to attempt to colonize it. The man who has fallen from a high estate into nothing, seizes upon ventures to regain his elevation, and the greater the risk he'may run and overcome, the greater will be his pride at his reexaltation, or, if of another temper, his thankfulness to Providence for his success.
 

 I cannot help thinking, topthat there is a caution In the terms of the grant, if taken in connection with the contract of 1795, very much in favor of its validity. As that contract did, it guards against the introduction of American settlers, which, under the former, the government had been able to prevent, by making its payments and grants of land only on proof that the families or emigrants' had come from Europe. And it not only forbids any interference with the previous settlers within the
 
 *887
 
 grant, who held by
 
 “ title in
 
 form,” or by virtue of a fresh commission, but imposes on the Marquis an obligation
 
 “
 
 to maintain and support them in all of their rights,” — that is, titles made and granted to other persons within the region comprehended in the figurativé plan of Trudeau, just as that grant was made to the Marquis, and which, when they were found to exist, the Marquis was permitted to have land elsewhere, in equal quantities.
 

 Hitherto I havp endeavoured to show, in this part of the case, —made so, however, only by the decision of the majority of the court, — that the grant was authentic and genuine, from the internal evidence in it connected with that of the contract of 1795, and from the services of the Marquis in fulfilling that contract, in conformity with the national policy of Spain in respect, to settlers on the Washita. But I have done so more for the purpose of showing its reasonableness, and to resist suggestions against it, than with any intention of relying upon it myself, exclusively, as conclusive of the fact, of the execution of the grant by Carondelet, with the figurative plan of Trudeau contemporarily annexed; ■ for -the execution of the grant is proved by the witness Tessier, just as the law of Louisiana, or the civil law of Spain, required that it should be, for the purpose of verifying, in the trial of a suit, any instrument (escritura) upon which a party in it relies for establishment of his right.
 

 . An instrument of writing (escritura) is every deed that is made by the hand of a public escribano, or notary of a corporation, or council
 
 (concejo),
 
 or sealed with the seal of the king, or other authorized “ person.” L. 1, tit. 18, p. 3. “ Hence arise the two kinds which- produce full faith and full proof; — one public, made by the.
 
 escribano
 
 or notary, with the solemnities prescribed by laws
 
 ”
 
 ; “ another authentic, which is that sealed by the king, bishops, prelates, and great men of the kingdom.” Either of these is, in suits, judicially proved, when such as are distinctively
 
 “
 
 public ” are signed by a
 
 “
 
 public escribano,” when it is not wanting in any required solemnity, and when the deed or original is confirmed by the register or protocol, in the
 
 escribamos
 
 records.; and when the deed is of that denomination called “ authentic,” — from being signed by the king, or an officer authorized by the royal order of the king, special or general, — the proof of such signature, and the instrument having a proper seal, establishes it, without any reference to. the protocol of it, in the public archives, when it appears that the protocol, or order for it, has been lost, or is beyond the jurisdiction of the court, so that the conformity between the original and the protocol cannot be ascertained by
 
 *888
 
 the process of the court. It must be recollected, that the deed given to the party is the original, though taken from the register or protocol; and that, in the law of Louisiana, or civil law of Spain, a .copy, or
 
 traslado,
 
 is the transcript from that original.
 

 Now, it is. by just such proof as I have mentioned, that the grant to the Marquis de Maison Rouge has been established in this case, as ah authentic original, proved not by one witness only, but by two, with a positiveness of declaration and knowledge of the fact of the signatures to the grant' that cannot be made stronger. Mr. Dubigny, Secretary of State for Louisiana, (pp. 53, 54, of the record,) says, that “he recognizes the signatures
 
 ‘
 
 to the deed ’ of the aforesaid Baron de Carondelet, and of Don Andres Lopez Armesto, the secretary of the government of Louisiana, as genuine, and of the proper handwriting of these persons respectively; that the said instrument is in the handwriting of Charles Tessier,. Esq., of Baton Rouge, who was then first clerk in the secretary’s office ” ; and he “ moreover declares, that he had a knowledge thereof about the time it was issued, and that it (the grant) was a maker of public notoriety.” This affidavit was made by Mr. Dubigny in 1824, before Galvin Prual, Esq., a justice of the peace for the city of New Orleans. Nineteen years afterwards, on the 22d of May, 1843, Charles Tessier, Esq., the same person mentioned by Mr. Dubigny, is examined in this case, by vir-. tue of a commission for that purpose issued by the Circuit Court, and he says, in answer to the direct interrogatories put to him, repeating the same also to the cross-interrogatories, without deviation or alteration, except in other particulars, showing his forbearance in speaking of the transaction after such a lapse of time, — he says that “ he is above sixty-seven years of age; that he was a native of Louisiana; that he was, when the grant, was made, principal clerk in the office of the Spanish government for making grants of land') and that he is now the judge of the parish of East Baton Rouge; that the grant marked A is filled up in the handwriting of this- deponent, who was chief clerk of the Spanish government of Louisiana at1 the time, and did the land-office business in filling up grants; that he is familiar with the handwriting of the governor, Baron de Carondélet, and of Don Andres Lopez Armesto, secretary of the government; the deponent has often seen them both write and sign their names; the signatures of Governor Carondelet and Secretary Armesto to the document A are both genuine.” What more "than the testimony of these • two witnesses — both of unquestioned character, each in hi§ life signalized in their community by holding offices of public
 
 *889
 
 trust and confidence — can be wanting, to establish the genuineness of the grant to Maison Rouge? But there is more. Tessier further says, that “ he has á personal knowledge of the time when the said grant was made and issued, because he filled it up at the time of its date ; his knowledge was therefore personal, as he performed the service
 
 ;
 
 the grant was not a secret, but of public notoriety; that the grant was denominated and considered a
 
 tituló. en firma,
 
 Jand was such complete and perfect evidence of title as not to require any other to validate or strengthen it; that he was familiar with the operations, forms, usages, and customs of' the land department' under Governor Carondelet; and that though he, at this distance of time, nearly fifty years since, cannot recollect whether Carlos Trudeau’s plan and process verbal was or was not before his eyes when.he filled up the-body of'the grant A, he always obeyed, the orders of the Baron de .Carondelet, and of the secretary of. the government, Don Andres Lopez Armesto, and in this in-' stance, as in others, performed his official duty.” - Hé repeats, to anothér interrogatory, “ that at this distance of time, forty-six years, he is unable to say whether he had or had not Trudeau’s figurative plan and process verbal before him; but he is certain he performed his duty, either by dictation or written instructions of his superiors, or by seeing the document B (Brengier’s copy of Trudeau’s figurative plan), though he can-hot say in which of the three respective modes he acted upon the occasion,’ there was a general form of ordinary grants, which changed when the grant was special, for certain purposes and under certain conditions, and the governor or secretary then usually, dictated or wrote the words of the grant, which was afterwards copied
 
 ;
 
 but he cannot recollect how it was in this instance.” And in his answer to the cross-interrogatory, he says that, “ in his answers to the interrogatories in chief, he has answered the different questions as well as he could, and endeavoured to discriminate .between their opinions and his own personal knowledge of matters.”
 

 The proof of the grant, then, is positive, but suspicion is attempted to be thrown upon it by the denial of the fact it recites, that the. figurative plan of Trudeau was annexed to it, when it was signed bjf the governor. And that denial rests upon Tessier’s forbearing to state positively that it was before him when he filled up the grant, and upon Girod’s pamphlet and the
 
 ex parte
 
 testimony annexed to it. Now, before any suspicion of the grant can arise from Tessier not being able to swear positively to that fact, it must appear that it was in the order of the business of the Spanish land-office, and that it was required by the laws and usages, of Spain in Louisiana, that such
 
 *890
 
 figurative plans — which, it must'be remembered, are not actual surveys, but descriptions of natural boundaries in a grant, in conformity with which actual surveys were afterwards to be made —should form a part of that muniment of title in the land-office from which the secretary made or filled up the grant, and that
 
 it
 
 was not sufficient for such a statement
 
 to
 
 be made of it as there is in the grant in this instance. I will make no assertion upon this point in respect to ■ what was the practice in Louisiana when it was a province of Spain; but Florida land grants and those of Louisiana were made under royal orders of the king of Spain, and I can say, that, in our judicial affirmation in this court of Florida land claims, we have not in any instance called for a figurative plan in any one of them, but have in several of them ordered surveys to bé made from the descriptions in the grants. But I may also say, that there isá good reason why the figurative plan of an extended grant should not have been before the secretary who filled it up at the time when he did so, and it is this; — that the figurative plan was a mere delineation of what the grant, by conformable description, gayé, and that, as the verification of the delineation by actual survey could only establish the locality of the land, it was not in a condition before that was done for official registry. Under the Spanish law, the survey of the surveyor-general or his authorized deputies was conclusive of the locality of the grant, but the grant itself gave property to the grantee. It was property meant to be protected by the treaty. Though no survey had been made by the Spanish surveyors before the treaty was made, surveys afterwards, in conformity with the grant, have been always deemed sufficient by this court, and where a case has occurred, under a claim of a Spanish grant, where there had been, either before or after the treaty, an imperfect survey, this court, upon being satisfied of the genuine-, ness of the grant, has ordered the survey to be made, to carry out the grant to its originally intended consummation. See the case of The United States
 
 v.
 
 Forbes, 15 Peters.
 

 But how can the contemporary annexation of. the' figurative plan to the Maison Rouge grant be denied in this case, after the proof of the signatures of the governor and secretary • to the grant ? Those officers assert in the' grant that it was annexed, with limits and boundaries designated by Don Carlos Trudeau. Now, unless these signatures are disproved, or it is proved that the governor, Carondelet, and the secretary, Armesto, had combined to practise a fraud upon their sovereign, by the assertion of a fact in a deed which did not exist, the fact that it was annexed to the grant when it was made cannot be denied. .The deed or grant, when proved, is good for all that it contains, whether
 
 *891
 
 it be for what is granted, or' for a fact by which that is to be thereafter practically ascertained; and neither is deniable but for fraud in the making of the. grant. Or the grant may be shown to have been made without authority or contrary to law. Neither fraud nor violation of law is imputed to this grant, and it stands good for all that is asserted in it, against any suspicion of fraud which alleges that the figurative plan of Trudeau had been antedated. But, further still, against such a suspicion,' shall no force be given to the declaration of Trudeau himself in such a case ? His signature to the figurative plan is proved. He was the surveyor-general, whose duty it was to make for the governor, by his order,, such a figurative plan, before the governor could make the grant. A plan is made purporting to be signed by Trudeau, his signature is proved to be genuine, the governor and his secretary recognize it to be such by making a grant according to it; the character of Trudeau for private virtue a.nd official ability and integrity is proved by those who knew him. If all this bejiot proof positive that the figurative plan had-been made and was annexed to the grant contemporarily with its execution, then no proof, will suffice, and our rejection of it involves a denial of all truthful character in the three highest functionaries then representing the king of Spain in Louisiana, the Baron de Carondelet, Secretary Armesto, and the Surveyer-General Trudeau. ■ Such is the consequence concerning these men; but I know the majority of this court do not mean it, for if the more subordinate condition of two of ■them had not imposed upon their contemporaries the conviction that they were uninfected by the corruption which we are too apt to suppose degraded the provincial officers of Spain, the Baron Carondelet- lived in his long career of public service to his sovereign, and died in it, unsuspected.
 

 I will not take up further time by making any remarks upon the • suggestion, that the grant of June, 1797, was not meant to' convey land to the Marquis de Maison Rouge for himself, but was a grant for emigrants, as the contract of 1795 with him was, except, to say, that it would indeed be very singular if the two were for-the same purpose; that -in that of 1795 the government of Spain bore all the burdens of colonization, and in the grant of June 20th, 1797, no provision is made for such a purpose, but they were to be borne by the Marquis de Maison Rouge, an impoverished
 
 emigré,
 
 from France, and whose poverty in his humble residence in a wilderness, bought by him for a small price, is proved in the record, and rélied upon by this court, as it is shown in his will by his use of the word
 
 bienes
 
 as a reason that such a -grant was not made to him. He used that word
 
 bienes
 
 — as any other person who had been brought up
 
 *892
 
 under the civil law would have done — as signifying all that a man can own, or which can be property. Besides, however, the difference in regard to the expenses of colonization in the two instruments just mentioned, that they were not meant for the same purpose, without benefit to the Marquis in the last, is very conclusively shown by the fact that they were made by different authorities, — the one by the-governor, Carondelet, without operation until it received the approval of the king, because it involved the expenditure of the king’s revenue; that of June, 1797, by the governor himself, who, by the royal order, was authorized to make grants of land without the special assent of the king to such grants.
 

 It is true that the language of the grant to the Marquis, after saying that he “ is near completing the establishment of the Washita, which he was authorized to make for thirty families by the royal order of July 14th, 1795,” does recite further, “ that, desirous to remove for the future'’ all doubt respecting other families or colonists who may come to establish themselves, we destine and appropriate conclusively for the establishment of the aforesaid Marquis de Maison Rouge the thirty superficial leagues marked in the plan annexed to the head of this instrument.” But the extension of colonization implied by it certainly cannot become a fact of a previous contract for that purpose, almost already completed, without the same terms for its enlargement as the king of Spain imposed upon his. treasury in the first contract, or other terms expressed and assented to by the Marquis. And I will further say, if this grant, from its terms, can be interpreted, to convey land for emigrants, of which the Marquis was only a trustee, that the terms used in it will be equally effective to convey to the Marquis the dominion of the land for himself, if the facts in the case and the reasoning upon them shall preponderate in favor of the latter interpretation. • In other words, the suggestion of the court in the opinion, of a conveyance having been in tended for colonists, and not for the Marquis, admits, so far as the suggestion conveys the first idea, that the words of the grant are sufficient to convey the land by such an instrument. There can be no objection to the grant, then, on account of a deficiency of formal terms of conveyance. Such services were never required by the civil law of Spain to make a good grant for land. Any words for that purpose are enough, in a grant from which an equitable title can be inferred for‘the grantee. The suit of the' United States against King is in the nature of a writ of ejectment. Inasmuch, however, as the distinction, so well known in England -and in our States in the United States, between courts .of équity and courts of common law does not prevail in
 
 *893
 
 Louisiana, what in England would be recognized as a ¡purely equitable title may serve as well in a court in Louisiana as a perfect legal title, either to maintain the claim of the United States, or as a defence on the. part of the defendant against such demand. In the case of The United States
 
 v.
 
 Fitzgerald, 15 Peters, this court recognized what has , just, been said to .be the correct doctrine of the Circuit Court of the United States sitting in Louisiana, and gave judgment for the defendant in a writ of error, upon á right purely equitable, against the strictly legal title of the United States, in a petitory action for the recovery of land. ,
 

 But let it be admitted, for the sake of the argument, that the instrument of June 20th, 1797, was designed to carry out more extensively the contract of 1795, either for the benefit of the settlers who had been already introduced under that, contract, or for other , colonists who might thereafter be placed upon the land by the Marquis, I cannot see how the right of. the United States to recoverin this action is in any way strengthened..
 

 Whether, the thirty leagues were assigned to the Marquis for his own use, or in trust.for others, — whether he was tó be the •sole and exclusive, proprietor, or was tp hold it, as is contended, for the benefit of others, — is a question with which the United States have nothing to do. That is wholly betweén the Marquis, as holding the legal title, and those who may advance a claim as
 
 cesiui qite use.
 

 In either case, the land was severed from the public- domain and became private property. It could not, in either case, pass,’ by any construction of the treaty, to the United States. They have neither a legal nor equitable title to the land. In order to entitle the United States to a judgment, they must affirmatively aver and prove a title in themselves.
 

 The very pretension that the Marquis received this' grant as a trustee for others is as fatal, against
 
 a
 
 recovery by the United States as if the entire legal'and equitable title were conceded to be; as in my judgment it is clearly shown, to be, vested absolutely and exclusively in the Marquis de Maison Rouge.
 

 I have written much upon this case, I know, — more than I usually permit myself to do in any case; but less would not have shown the judicial history of this, from the beginning of the action to its first appearance in this court, or our judgment and vacated judgment afterwards, and now the .course which this court has taken upon the writ of error to reverse the judgment of the Circuit Court.
 

 One word more. The mandate upon the'decision here made is for the reversal of the judgtneht given in favor of King for the land for which the United States sued him. The case will
 
 *894
 
 of course be before the Circuit Court of Louisiana again, when ■ new evidence on both- sides may be introduced, or, if that does not exist, for that court to correct the error in its .judgment. It cannot do so by any decision of this court upon the bills of exceptions in the record. The reversal is for causes or errors )í¡aid to be . in the judgment. If, then, the'Circuit Court shall, in its further trial of this cause, be of the opinion that the evidence proves title to the land in King, .1 presume that the mandate will be satisfied if it gives a judgment in his favor again for that quantity of land for which the United States has sued, without saying any thing about the validity of the title, or declaring that Mr. Coxe is an owner of any part of the Maison Rouge grant.
 

 Order.
 

 This cause came on to be heard on the transcript of the rec--ord from the Circuit Court of the United States for the Eastern District of Louisiana, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, reversed, and that this cause be, and the same is hereby, remanded to the said Circuit Court, with directions to that court to enter judgment for the United States for the land described in the petition.